Filed 7/9/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S213819 |
| v. | ) | |
| | ) | Ct.App. 2/2 B236152 |
| LEON BANKS et al., | ) | |
| | ) | Los Angeles County |
| Defendants and Appellants. | ) | Super. Ct. No. BA347305 |
| _____ | ) | |

In 1990, the voters passed Proposition 115, which adopted a wide range of criminal justice reforms, including extending death penalty eligibility to "major participant[s]" in felony murders. (Pen. Code, § 190.2, subd. (d)[1] (section 190.2(d)), added by initiative, Primary Elec. (June 5, 1990) Prop. 115, § 10; see *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 342–345.) The issue before us is under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty.

Section 190.2(d) was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their

---

[1] All further statutory citations are to the Penal Code.

involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions. Section 190.2(d) must be accorded the same meaning.

Here, defendant Lovie Troy Matthews acted as the getaway driver for an armed robbery in which Leon Banks and others participated. In the course of escaping, Banks shot one of the robbery victims. A jury found Matthews guilty of first degree murder under a felony-murder theory and found true a felony-murder special circumstance. The People did not seek the death penalty; consequently, Matthews received the mandatory lesser sentence for special circumstance murder, life imprisonment without parole. (§ 190.2, subd. (a).) Section 190.2(d) must be given the same interpretation irrespective of whether the defendant is subsequently sentenced to death or life imprisonment without parole. Because the record establishes Matthews was no more culpable than the getaway driver in *Enmund v. Florida, supra*, 458 U.S. 782, the evidence was insufficient as a matter of law to support the special circumstance, and Matthews is statutorily ineligible for life imprisonment without parole. We reverse the Court of Appeal's contrary decision and remand for resentencing.

PROCEDURAL AND FACTUAL BACKGROUND

Matthews's culpability for first degree felony murder is not in dispute. We address only those facts relevant to the narrow issue on which we granted review, whether Matthews can be found guilty of special circumstance murder and sentenced to life imprisonment without parole. We recite the evidence in the light most favorable to the jury's verdict. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)

The La Brea Collective is a Los Angeles medical marijuana dispensary. At its 2008 location, the dispensary had a metal security door providing access from the sidewalk and behind that door a sally port and second lockable door leading

2

into the lobby. Patients who rang the front doorbell were required to pass identification and a physician's medical marijuana recommendation through a slot in the door to a security guard, Noe Gonzalez, stationed in the sally port. Once the papers were verified, patients would be escorted through the sally port and second locked door into the dispensary lobby. Surveillance cameras monitored the premises.

On the afternoon of October 1, 2008, an employee looked at the camera monitor and saw Gonzalez being escorted into the lobby by two men armed with guns. The two men and a third accomplice, later identified as Leon Banks, David Gardiner, and Brandon Daniels, began tying up employees and searching the premises. One of them asked an employee, "Where's the stuff at?" When shots were fired, the three stopped and fled. An employee watched on the monitor as the three reached the front door and struggled to exit. Banks returned to the lobby and fired a shot out the front window. After additional shots were fired, the three were able to escape.

A witness across the street saw Gonzalez trying to push the front door closed from the outside. The witness saw Banks reach his hand around the door from the inside and shoot Gonzalez. As Gonzalez fell, Banks stepped out and shot him again. Banks, Gardiner, and Daniels fled on foot.

A driver passing the dispensary at approximately 3:45 p.m. heard popping sounds and saw Banks and Gonzalez struggling at the dispensary's front door. Both had guns and were reaching around the door and shooting at each other. When the driver pulled over and looked back, he saw Gonzalez lying on the sidewalk.

On a residential street one block from the dispensary, a man was standing on the sidewalk in front of his house when Daniels ran by and asked to use his bathroom. The man refused, causing Daniels to pause. An SUV with paper

3

license plates reading "Power" came around the corner, and Daniels screamed "Troy, Troy" (Matthews's middle name). The SUV slowed without completely stopping. Daniels jumped in, another man later identified as Gardiner came across the street and jumped in as well, and Matthews drove off.

Police responding to the scene found Gonzalez dead on the sidewalk, a revolver with his DNA on it on the ground near his outstretched arm.[2] The revolver contained two live rounds and three spent rounds. Within minutes, Banks was captured on foot near the dispensary. Later that afternoon, an SUV with paper Power plates was stopped a few blocks from the dispensary; Matthews, the driver and sole occupant, was arrested. The SUV was registered to Banks and another person, and clothing belonging to Banks was found inside. In a field show-up, witnesses identified Banks as the shooter. Over the next few days, police found at or near the dispensary a photocopy of a doctor's medical marijuana recommendation and Banks's driver's license, zip ties, gloves, a holster, and a semiautomatic handgun. DNA, fingerprint, and palm print testing tied Banks, Daniels, and Gardiner to the dispensary, gloves, zip ties, and doctor's statement, but excluded Matthews. Ballistics tests confirmed the semiautomatic handgun was the murder weapon.

Cellphones were recovered from Banks and Matthews. Call records showed Matthews called Banks six times during the afternoon of October 1. Each call lasted between 20 and 50 seconds; the calls came at 2:53, 3:46, 3:49, 3:51, 3:53, and 3:56 p.m. It was not possible to determine whether the two spoke or these calls went to voicemail. Banks called Matthews three times, at 1:49, 3:44,

_____

[2] Gonzalez's coworkers testified he was unarmed while on duty. The source of Gonzalez's gun was never conclusively established.

4

and 3:58 p.m., with each call lasting approximately 20 seconds; these calls were answered.

Matthews was wearing a global positioning system (GPS) tracking device that showed his movements to within 15 meters. An expert testified Matthews was on the block containing the dispensary at 2:51 p.m., then three blocks away at 3:00 p.m., where he remained for approximately 45 minutes. At 3:46 p.m., Matthews moved toward the dispensary and made a series of stops within a few blocks of it over the next few minutes.

A gang expert testified Matthews, Gardiner, and Daniels were members of the same criminal street gang. The gang's primary activities were described generally as narcotics sales, burglaries, robberies, shootings, attempted murders, murders, and gun possession. No evidence was presented that Matthews, Gardiner, or Daniels had killed before, or that Matthews knew any of the three had killed before. The expert testified Banks was not a member of the gang.

Banks and Matthews were tried together. Matthews did not present any evidence on his own behalf but argued the prosecution had failed to carry its burden of proof.

A jury convicted Matthews of first degree murder and found true the special circumstance that the murder was committed during an attempted robbery or burglary. (§§ 187, subd. (a), 190.2, subd. (a)(17).) He was also convicted of burglary and attempted robbery with gang and firearm enhancements. (§§ 186.22, subd. (b)(1), 211, 459, 664, former 12022.53, subds. (d), (e).) Because the prosecution did not seek the death penalty, Matthews was sentenced to life imprisonment without parole.

On appeal, the Court of Appeal rejected Matthews's challenge to the sufficiency of the evidence supporting the special-circumstance true finding. It held his actions as a getaway driver in supporting the underlying robbery, with

knowledge death was always a possibility in an armed robbery, were legally sufficient under section 190.2(d). Given the significance of section 190.2(d) in determining which felony murderers are eligible for either life imprisonment without parole and death, or a lesser sentence, we granted review to address its proper construction.

## DISCUSSION

I.    *The Felony-murder Aider and Abettor Special Circumstance*

The federal Constitution's Eighth Amendment does not prohibit the death penalty, but it does require that states offer guidance to sentencing bodies tasked with differentiating those for whom death is appropriate from those for whom it is not. (*Gregg v. Georgia* (1976) 428 U.S. 153, 187–189; *People v. Crittenden* (1994) 9 Cal.4th 83, 154; *People v. Green* (1980) 27 Cal.3d 1, 48.) California provides this guidance through a two-step process. First, a list of special circumstances identifies those crimes deemed sufficiently reprehensible to warrant possible punishment by death. (§ 190.2; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467–468.) If a sentencer finds one or more special circumstances true, the defendant becomes death eligible and must be sentenced to either death or life without the possibility of parole. (§ 190.2, subd. (a).) Second, the sentencer must consider potential statutory aggravating factors and weigh them against any mitigating factors to determine whether death or life imprisonment without parole is the appropriate punishment. (§ 190.3; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–980; *Bacigalupo*, at pp. 468–470.)

The special circumstances statute extends death eligibility not only to killers, but also to certain aiders and abettors of first degree murder. (§ 190.2,

6

subds. (c), (d).)[3]  In the case of first degree felony murder, "every person, not the actual killer, who, with reckless indifference to human life and as a major participant" aids or abets the crime may be convicted of special-circumstance murder.  (*Id.*, subd. (d).)  The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life.[4]

Section 190.2(d) does not define what qualifies as major participation, but the statutory history shows where to find guidance.  As noted, the provision was adopted by voter initiative.  (See Prop. 115, as approved by voters, Primary Elec. (June 5, 1990), § 10.)  Supporters argued the initiative's " 'BIRD COURT' DEATH PENALTY PROVISIONS [would] improve our death penalty law and overturn decisions by Rose Bird and her allies which made it nearly inoperative." (Ballot Pamp., Primary Elec. (June 5, 1990) argument in favor of Prop. 115, p. 34.)  Among those decisions, *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 135, had held the felony-murder special circumstance (§ 190.2, subd. (a)(17)) required an intent to kill.  The post-Bird Court decision *People v. Anderson* (1987) 43 Cal.3d 1104, 1147, had occasion to overrule *Carlos* only insofar as it had required an intent to kill for actual killers, leaving in place the intent requirement for aiders and abettors.  Thus, as it stood in 1990, state law made only those

---

[3]     As relevant here, involvement in both burglary murder and robbery murder can subject an aider and abettor to death.  (§ 190.2, subds. (a)(17)(A) & (G), (d).)

[4]     Alternatively, aiders and abettors who act with the intent to kill become death eligible whether or not their conduct makes them major participants in the crime.  (§ 190.2, subd. (c).)  The prosecution did not argue Matthews had the intent to kill, relying exclusively on the theory he was a major participant who acted with reckless indifference to human life.

felony-murder aiders and abettors who intended to kill eligible for a death sentence. (*People v. Mil* (2012) 53 Cal.4th 400, 408.)

Proposition 115 revised the scope of capital liability for aiding and abetting felony murders by looking to federal constitutional law. The text of new section 190.2(d) mirrored the holding of, and was intended to bring "state law into conformity with[,] *Tison* v. *Arizona*[*, supra*,] 481 U.S. 137," the United States Supreme Court's most recent word on capital punishment for involvement in felony murders. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298, fn. 16; see *People v. Estrada* (1995) 11 Cal.4th 568, 575, 580.) The term "major participant" is borrowed directly from *Tison*. (*Tison*, at p. 158, fn. 12.) Because "*Tison* is the source of the language of section 190.2(d)" (*Estrada,* at p. 575), we "look[] to *Tison* for the meaning of the statutory phrase[s]" derived from it (*id.* at p. 576).

II.     Tison v. Arizona *and* Enmund v. Florida

To understand the import of *Tison*, we start with an earlier case upon which *Tison* builds, *Enmund v. Florida, supra*, 458 U.S. 782. In that case, defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death. (*Id.* at pp. 784–787; *Enmund v. State* (1981) 399 So.2d 1362, 1363–1367, revd. *sub nom. Enmund v. Florida, supra*, 458 U.S. 782.)

On these facts, the United States Supreme Court reversed Enmund's death sentence as prohibited by the federal Constitution. The court found a broad consensus against imposing death in cases "where the defendant did not commit

8

the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." (*Enmund v. Florida, supra*, 458 U.S. at p. 795.) Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, at p. 797.) The intent to commit an armed robbery is insufficient; absent the further "intention of participating in or facilitating a murder" (*id.* at p. 798), a defendant who acts as "the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape" (*id.* at p. 788) cannot constitutionally be sentenced to death.

In *Tison v. Arizona, supra*, 481 U.S. 137, the Supreme Court revisited the issue of death sentences for those guilty of felony murder as accomplices. Prisoner Gary Tison's sons Ricky and Raymond Tison, with their brother Donald, conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. (*Id.* at pp. 139–141.) Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was " 'very substantial' " and they could have foreseen their actions would " 'create a grave

9

risk of . . . death.' " (*Id.* at p. 142.)  The Arizona Supreme Court denied relief.
(*Id.* at pp. 143–145.)

The United States Supreme Court granted Ricky's and Raymond's petitions
to consider the application of *Enmund* to these facts.  The court began by
discussing at length and endorsing *Enmund*'s holding that the Eighth Amendment
limits the ability of states to impose death for "felony murder *simpliciter*."  (*Tison
v. Arizona, supra*, 481 U.S. at p. 147; see *id.* at pp. 146–150.)  Specifically, *Tison*
described the range of felony-murder participants as a spectrum.  At one extreme
were people like "Enmund himself:  the minor actor in an armed robbery, not on
the scene, who neither intended to kill nor was found to have had any culpable
mental state."  (*Id.* at p. 149.)  At the other extreme were actual killers and those
who attempted or intended to kill.  (*Id.* at p. 150.)  Under *Enmund*, *Tison* held,
death was disproportional and impermissible for those at the former pole, but
permissible for those at the latter.  (*Ibid.*)  The Supreme Court then addressed the
gray area in between, the proportionality of capital punishment for felony-murder
participants who, like the two surviving Tison brothers, fell "into neither of these
neat categories."  (*Ibid.*)  Here, the court announced, "major participation in the
felony committed, combined with reckless indifference to human life, is sufficient
to satisfy the *Enmund* culpability requirement."  (*Id.* at p. 158.)  This is the
language the electorate codified in section 190.2(d).

The Supreme Court has yet to revisit *Tison* and *Enmund*.  The only
guidance its subsequent cases offer comes from *Kennedy v. Louisiana* (2008) 554
U.S. 407, 421, where the court in dicta characterized the governing standard as
permitting the death penalty for nonkillers whose "involvement in the events
leading up to the murders was active, recklessly indifferent, and substantial."  Nor,
save once, have this state's courts elaborated on the test for death eligibility for
nonkillers.  The exception is *People v. Proby* (1998) 60 Cal.App.4th 922, which

10

concluded "major participation" should be understood as the phrase is used in common parlance, as including those whose involvement is " 'notable or conspicuous in effect or scope' " and who are " 'one of the larger or more important members . . . of a . . . group.' " (*Id.* at pp. 933–934, quoting Webster's 3d New Internat. Dict. (3d ed. 1971) p. 1363; see *People v. Smith* (2005) 135 Cal.App.4th 914, 928 [adopting *Proby*'s gloss]; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 579–580 [same].)

We agree with *People v. Proby, supra*, 60 Cal.App.4th 922 that there is no reason to think either the United States Supreme Court in *Tison* or the drafters of Proposition 115 had in mind a specialized or technical meaning for "major participant." *Proby*'s gloss on that phrase and the *Kennedy v. Louisiana* dictum, that a defendant must have been actively and substantially involved in the events leading up to a murder (*Kennedy v. Louisiana, supra*, 554 U.S. at p. 421), are of some help. But rephrasing *Tison*'s dictates in essentially synonymous words takes us only so far. To gain a deeper understanding of the governing test and offer further guidance, we examine more closely *Tison* and *Enmund*.

The two cases embrace the United States Supreme Court's long-standing recognition that, in capital cases above all, punishment must accord with individual culpability. States may "make aiders and abettors equally responsible, as a matter of law, with principals, or . . . enact felony-murder statutes" that make individual involvement in an underlying crime enough to hold a nonkiller liable for first degree murder. (*Lockett v. Ohio* (1978) 438 U.S. 586, 602.) However, "the definition of crimes generally has not been thought automatically to dictate what should be the proper penalty." (*Ibid.*) When it comes time to determine a proportionate punishment, the Constitution requires more: "an individualized decision is essential in capital cases." (*Lockett*, at p. 605; see *Tison v. Arizona, supra*, 481 U.S. at p. 149 [a state must "inquire into the relevant facets of 'the

11

character and record of the individual offender' "]; *id.* at p. 156 [noting the "individualized determination of culpability required in capital cases"]; *Enmund v. Florida, supra,* 458 U.S. at p. 798 ["The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims"].)  A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime.  (See *Tison*, at p. 158 [evaluating "[t]he petitioners' own personal involvement in the crimes"]; *Enmund*, at p. 798 [though Earl Enmund participated in an armed robbery, he "did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed"].)

With respect to the mental aspect of culpability, *Tison*, and in turn section 190.2(d), look to whether a defendant has " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " (*People v. Estrada, supra*, 11 Cal.4th at p. 577, quoting *Tison v. Arizona, supra*, 481 U.S. at p. 157.)  The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.  There is an "apparent consensus that substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty" (*Tison*, at p. 154); accordingly, the death penalty may be applied to those who, like the Tisons, "subjectively appreciated that their acts were likely to result in the taking of innocent life" (*id.* at p. 152).

With respect to conduct, *Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund.  The defendants' actions in *Tison v. Arizona, supra*, 481 U.S. 137 and *Enmund v.*

12

*Florida, supra*, 458 U.S. 782 represent points on a continuum. (*Tison*, at pp. 149–151.) Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility. Because the Supreme Court found it unnecessary to "precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty" (*id*. at p. 158), it follows that a jury presented with this question must consider the totality of the circumstances. The specific facts of the two cases illuminate the sort of considerations that may be relevant to a jury's deliberations.

In *Tison*, Ricky and Raymond Tison helped plan and carry out the escape of two convicted murderers from prison—one of whom, Gary Tison, was serving a life sentence for killing a guard in the course of a previous escape. (*Tison v. Arizona, supra*, 481 U.S. at p. 139.) This entailed their bringing a cache of weapons to prison, arming both murderers, and holding at gunpoint guards and visitors alike. (*Id.* at p. 151.) There was no similar evidence that Enmund's confederates were killers, or that he knew they were. Raymond Tison "[b]y his own admission . . . was prepared to kill in furtherance of the prison break." (*Ibid.*) There was no similar admission from Enmund. As part of the ongoing escape, Ricky and Raymond Tison later participated in stopping and capturing an "innocent family whose fate was then entrusted to the known killers [they] had previously armed." (*Ibid.*) They robbed the family and held them at gunpoint while the two murderers deliberated whether the family should live or die, then stood by while all four members were shot. (*Ibid.*) Enmund, in contrast, was absent from the scene, with no opportunity to contribute to or prevent the actual killing.

The Tisons did not assist in a garden-variety armed robbery, where death might be possible but not probable, but were substantially involved in a course of

13

conduct that could be found to entail a likelihood of death; distinguishing *Enmund*, the Supreme Court said: "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." (*Tison v. Arizona, supra*, 481 U.S. at p. 158.)  Unlike the Tisons, Earl Enmund *was* just a getaway driver, sitting in a car away from the murders.  Execution of minor, absent participants like Enmund remained disproportionate and constitutionally intolerable.  (*Id.* at p. 149.)

Among those factors that distinguish the Tisons from Enmund, and thus may play a role in determining whether a defendant's culpability is sufficient to make him or her death eligible, are these:  What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death?[5]  What did the defendant do after lethal force was used?  No one of these

---

[5]    In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death.  (See *Enmund v. Florida, supra*, 458 U.S. at p. 795 [identifying a national consensus against death for nonkillers who did not plot murder and were "not present when the killing took place"].)  Those not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life.  Nor, conversely, are they in a position to take steps that directly and immediately lead to death, as with the Tisons' capturing and standing guard over the victims.  (See *Tison v. Arizona, supra*, 481 U.S. at p. 158 [emphasizing the Tisons' physical presence and active involvement in every step].)

considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation "in criminal activities known to carry a grave risk of death" (*Tison v. Arizona, supra*, 481 U.S. at p. 157) was sufficiently significant to be considered "major" (*id.* at p. 152; see *Kennedy v. Louisiana, supra*, 554 U.S. at p. 421.)

The People propose we treat as a major participant potentially eligible for death anyone "whose conduct involves the intentional assumption of some responsibility for the completion of the crime regardless of whether the crime is ultimately successful. As such, participation in planning with the intent of facilitating the commission of the crime, or participating in conduct integral to or for the purpose of facilitating the commission of the crime, constitutes major participation." This test cannot be reconciled with the holdings of *Tison* and *Enmund*. Requiring only "the intentional assumption of some responsibility for the completion of the crime" would sweep in essentially every felony murderer— indeed, even Earl Enmund himself—whether an actual killer or not. Doing so would violate the Supreme Court's requirement that each felony murderer's culpability be considered individually and disregard the court's corresponding recognition that, for many nonkillers, death is disproportionate to that individual culpability and thus unconstitutional.

Finally, we note the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole. As a purely constitutional matter, nothing would foreclose California from imposing life imprisonment without parole sentences on felony murderers with Matthews's degree of culpability. (See *People v. Estrada, supra*, 11 Cal.4th at p. 575 [" 'reckless indifference to human life' " is not constitutionally required for a life imprisonment without parole sentence]; *People v. Johnson* (2010) 183

15

Cal.App.4th 253, 296–299 [rejecting an 8th Amend. challenge to a life imprisonment without parole sentence for a robbery-murder getaway driver].) Section 190.2(d) does not, however, extend eligibility for life imprisonment without parole to every defendant exhibiting the constitutionally minimum degree of culpability for that sentence. Instead, by importing the *Tison-Enmund* standard, it permits such a sentence only for those felons who constitutionally could also be subjected to the more severe punishment, death. As a matter of state statute, then, the *Tison-Enmund* standard is "applicable to *all* allegations of a felony-murder special circumstance, regardless of whether the People seek and exact the death penalty or a sentence of life without parole." (*Estrada*, at p. 576.) Accordingly, the considerations that informed the Supreme Court's distinctions between differing levels of culpability in *Tison v. Arizona, supra*, 481 U.S. 137 should guide juries faced with making those same distinctions under section 190.2(d).

III.    *Application*

When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt. (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) These same standards apply to challenges to the evidence underlying a true finding on a special circumstance. (*Edwards*, at p. 715.)

16

A.     Major participation

Considering the record in the light most favorable to the judgment, there was substantial evidence to show Matthews acted as the getaway driver for an armed robbery.  The jury could infer from Matthews's movements that he dropped his confederates off near the dispensary.  Matthews then waited three blocks away for approximately 45 minutes.  Moments after the shooting and a call from Banks, he drove toward the dispensary.  A witness saw Daniels flag Matthews down.  He slowed, Daniels and Gardiner got in, and he drove them away.

The evidence in the record places Matthews at the *Enmund* pole of the *Tison-Enmund* spectrum.  Indeed, as Matthews argues, his conduct is virtually indistinguishable from Earl Enmund's.  No evidence was introduced establishing Matthews's role, if any, in planning the robbery.[6]  No evidence was introduced establishing Matthews's role, if any, in procuring weapons.  Matthews and two confederates—though not the shooter—were gang members, but, in contrast to the convicted murderers the Tison brothers chose to free and arm, no evidence was introduced that Matthews, Gardiner or Daniels had themselves previously committed murder, attempted murder, or any other violent crime.  The crime itself was an armed robbery; *Enmund* and *Tison* together demonstrate that participation in an armed robbery, without more, does not involve "engaging in criminal

---

[6]     The People argue Matthews had a greater role than Enmund in planning their respective armed robberies, but the prosecution introduced no evidence that would support this.  At most, there was evidence Matthews participated in the robbery, from which a jury might reasonably infer he had some role in planning it, but the nature of that role is, on the record before us, a matter of pure conjecture.  In *Enmund*, in contrast, the trial court made express findings that Earl Enmund had planned the robbery.  (See *Enmund v. Florida, supra*, 458 U.S. at pp. 803–806, 809 (dis. opn. of O'Connor, J.); *Enmund v. State, supra*, 399 So.2d at pp. 1365, 1372–1373.)

17

activities known to carry a grave risk of death." (*Tison v. Arizona, supra*, 481 U.S. at p. 157.) During the robbery and murder, Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it.

On this record, Matthews was, in short, no more than a getaway driver, guilty like Earl Enmund of "felony murder *simpliciter*" (*Tison v. Arizona, supra*, 481 U.S. at p. 147; see *Enmund v. Florida, supra*, 458 U.S. at pp. 784–787; *Enmund v. State, supra*, 399 So.2d at p. 1370) but nothing greater. As such, he is ineligible for the death penalty under *Tison* and *Enmund*. Because section 190.2(d) incorporates the *Tison-Enmund* standard, if the evidence was insufficient to make Matthews death eligible under these cases, the evidence was also insufficient to find the special circumstance true and Matthews eligible for life imprisonment without parole under state law.

The Court of Appeal dismissed the relevance of comparisons to the facts of *Enmund v. Florida, supra*, 458 U.S. 782, treating *Enmund* as applicable only to the constitutionality of certain death sentences and immaterial to the present inquiry, whether as a statutory matter the section 190.2(d) special circumstance applies to Matthews. The People also argue *Enmund* has no bearing, noting that section 190.2(d)'s statutory language is drawn from *Tison*, not *Enmund*. But *Enmund* cannot be dismissed so easily. As we have explained, *Tison* did not overrule *Enmund*, but rather elaborated on the constitutional limits to punishment of felony-murder accomplices first announced there. (*Tison v. Arizona, supra*, 481 U.S. at p. 158 [defining what conduct would "satisfy the *Enmund* culpability requirement"]; see *Graham v. Florida* (2010) 560 U.S. 48, 69 [treating *Tison* and *Enmund* as of equal continuing vitality in marking the bounds of the 8th Amend.]; *Kennedy v. Louisiana, supra*, 554 U.S. at p. 421 [same]; *Ring v. Arizona* (2002)

536 U.S. 584, 594 [*Tison* represents a qualification of the rule in *Enmund*].)
Under the spectrum of culpable felony-murderer behavior *Tison* constructs, Earl
Enmund's conduct marks one end. (*Tison*, at pp. 149–150.) The facts and holding
of *Enmund* are thus essential to an understanding of that spectrum and where each
new case should be deemed to fall on it. *Enmund* is inseparable from *Tison*.

In the alternative, the People offer the prosecutor's closing argument below
to illustrate how Matthews's conduct can be distinguished from Earl Enmund's.
Tellingly, however, the closing argument offers no distinction; were one simply to
replace the names of those involved in this case with those involved in *Enmund v.
Florida, supra*, 458 U.S. 782, it would apply equally—save for the fact Enmund,
unlike Matthews, contributed to not one but two homicides: "And what 'major
participant' means is this: what was his involvement, how important was Mr.
[Enmund's] involvement in the crime, and with that you look at his actions. As
I've stated multiple times, Mr. [Enmund] is the one that gets everyone to this
location. Mr. [Enmund] is the guy that drives the getaway vehicle. Mr. [Enmund]
is the one that's supposed to pick up everybody at this location. [¶] You know,
short of Mr. [Armstrong] who actually killed Mr. [and Mrs. Kersey], next most
involved person had to be Mr. [Enmund], right? Mr. [Enmund] is the one that
started all this process. He gets everyone to the location, waits around, and his job
was to get everyone to safety afterwards. [¶] I submit to you, ladies and
gentlemen, that Mr. [Enmund] was a major participant. Without him, you don't
even have an attempted robbery. Without him, you don't have a burglary. And
honestly, without him taking Mr. [Armstrong] to this location, you wouldn't have
the murder of [the Kerseys]."

The People also highlight the evidence of cellphone contact between
Matthews and Banks, the shooter. The record shows a series of nine cellphone
calls between Matthews and Banks, each lasting less than one minute, and as

19

many as six of which may simply have gone to voicemail. No evidence about the content of the calls was introduced, and the bare evidence of the call records tells us nothing additional about Matthews's awareness of or involvement in the shooting. Banks and Matthews apparently spoke either hours before or shortly after the killing, and GPS evidence established Matthews was away from the scene until after the victim was dead. Earl Enmund, too, no doubt found out after the robbery that his coconspirators had killed two people, yet he still drove them away to safety and apparently directed disposal of the murder weapons. (*Enmund v. State, supra*, 399 So.2d at p. 1366.) Matthews, like Enmund and unlike the Tisons, did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance. The call records do nothing to increase Matthews's *role* beyond that of Enmund's; instead, they show only that technology has changed.

The other facts the People cite—that Matthews drove near the crime scene, sat in a parked car blocks away waiting for a signal to pick up his confederates, and afterward drove toward the dispensary and picked up two accomplices—show simply that he acted as a getaway driver. Earl Enmund, too, was a getaway driver who may have been involved in planning an armed robbery, but as a matter of precedent Enmund is the quintessential "minor actor." (*Tison v. Arizona, supra*, 481 U.S. at p. 149.) It follows that Matthews is as well and, as a matter of law, cannot qualify as a major participant under section 190.2(d).

B.      Reckless Indifference to Human Life

Consideration of Matthews's mens rea also leads us to conclude he is legally ineligible for a sentence of life imprisonment without parole. Reckless indifference to human life "requires the defendant be '*subjectively* aware that his or her participation in the felony involved a grave risk of death.' " (*People v. Mil, supra*, 53 Cal.4th at p. 417, quoting *People v. Estrada, supra*, 11 Cal.4th at

20

p. 577.)  There was evidence from which the jury could infer Matthews knew he was participating in an armed robbery.  But nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death.  There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before.  Instead, as in *Enmund*, Banks's killing of Gonzalez was apparently a spontaneous response to armed resistance from the victim.

The Court of Appeal, in a line of reasoning endorsed by the People, concluded that "[w]ith advance knowledge of the planned robbery and burglary, Matthews had to be aware of the risk of resistance and the extreme likelihood that death could result."[7]  According to the appellate court, Matthews's confederates surely "anticipated as much because they were armed," and although Matthews was not armed, the jury could readily infer Matthews knew his confederates were.

The problem with the sufficiency of such evidence to prove reckless indifference to human life is that *Enmund* and *Tison* deem identical evidence inadequate.  In *Enmund*, the Supreme Court rejected exactly this argument, that the risk of death inherent in an armed robbery justifies the death penalty simply for knowingly participating in such a crime.  "It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony.  But competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as

---

**7**    The prosecutor's closing argument rested on the same theory:  Matthews knowingly participated in a robbery, and the fact armed robberies carry with them "a possibility someone may get killed" is common knowledge.

21

a justifiable deterrent to the felony itself." (*Enmund v. Florida, supra*, 458 U.S. at p. 799.)

In *Tison* as well, the Arizona Supreme Court had employed the same logic as the Court of Appeal here, reasoning that the constitutional culpability requirement was satisfied by the fact a participant in an armed robbery could anticipate lethal force might be used. The United States Supreme Court was unpersuaded, observing Earl Enmund himself might well have anticipated the use of lethal force as a possibility, for "the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves." (*Tison v. Arizona, supra*, 481 U.S. at p. 151.) This understanding of the requisite culpability "amounts to little more than a restatement of the felony-murder rule itself" (*ibid.*), rendering death eligible every felony-murder accomplice and running afoul of the *Enmund* court's holding that death is a disproportionate penalty for participation in "felony murder *simpliciter*." (*Tison*, at p. 148; *id.* at pp. 146–149.) Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a "grave risk of death" satisfies the constitutional minimum. (*Id.* at p. 157.)

The People attempt to distinguish *Tison*'s discussion of the issue by noting it arose as part of the high court's rejection of the Arizona Supreme Court's equating knowledge of the foreseeability of possible death with the intent to kill called for by *Enmund*. However true, this point does not sap the discussion of its force. While *Tison* slightly revised the mental culpability necessary for death eligibility, from intent to kill to reckless indifference toward human life, it simultaneously concluded knowledge of the possible risk of death inherent in certain felonies (like armed robbery) would not satisfy this lesser standard either. The *Tison* court distinguished the defendants before it from "the category of

22

felony murderers for whom *Enmund* explicitly held the death penalty disproportional," because for the Tisons, unlike for Earl Enmund and his ilk, "the record would support a finding of the culpable mental state of reckless indifference to human life." (*Tison v. Arizona, supra*, 481 U.S. at p. 151.) The Supreme Court thus made clear felony murderers like Enmund, who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life. The Court of Appeal's equating Matthews's similar awareness with reckless indifference to human life cannot be squared with *Enmund* and *Tison*.[8]

Alternatively, the People highlight the United States Supreme Court's recognition that "there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of

---

[8] In *People v. Lopez* (2011) 198 Cal.App.4th 1106, the defendant was sentenced to life imprisonment without parole after she lured a man into an alley under the pretext of engaging in prostitution, whereupon he was robbed and murdered by her accomplice. The Court of Appeal opined that evidence the defendant knew her accomplice "had a gun shows that she acted with reckless indifference to the life of the man she lured into the alley." (*Id.* at p. 1116.) That the defendant may have acted with the requisite reckless indifference was supported by other evidence as well, and we need not resolve whether *Lopez* was correctly decided based on that other evidence. However, we disapprove *People v. Lopez, supra*, 198 Cal.App.4th 1106 to the extent it holds the knowledge one's accomplice is armed can, by itself, establish reckless indifference to human life under section 190.2(d).

In *People v. Hodgson, supra*, 111 Cal.App.4th 566, the Court of Appeal upheld a robbery-murder special circumstance, reasoning in part that the defendant "had to be aware use of a gun to effect the robbery presented a grave risk of death." (*Id.* at p. 580.) As with *Lopez*, there was other evidence to support the special circumstance, but we disapprove *People v. Hodgson, supra*, 111 Cal.App.4th 566 to the extent it may be read to hold awareness a robbery accomplice is armed, without more, establishes the necessary subjective awareness of a grave risk of death.

23

human life." (*Tison v. Arizona, supra*, 481 U.S. at p. 158, fn. 12.) They argue each crime listed in section 189 qualifies and thus Matthews, because he participated in two such crimes, robbery and burglary, has automatically exhibited reckless indifference to human life.

Section 189 codifies the first degree felony-murder rule (*People v. Harris* (2008) 43 Cal.4th 1269, 1294); participation in the crimes it lists subjects one to liability for first degree murder. To make participation in such crimes also sufficient, without more, to establish categorically reckless indifference to human life would collapse the *Tison* inquiry into the felony-murder inquiry and treat all felony murderers as equally culpable and eligible for death. But the central holding of *Enmund*, and *Tison* after it, was that for purposes of the death penalty, not all felony murderers are equally culpable and eligible for death. The People's position embraces the very punishment—death eligibility for participation in felony murder *simpliciter*—the Supreme Court has declared unconstitutional. (See *Tison v. Arizona, supra*, 481 U.S. at pp. 147–150; *Enmund v. Florida, supra*, 458 U.S. at p. 797.)

That one may infer the felonies listed in section 189 are those the Legislature views as "inherently dangerous" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197) does not change the analysis. Whether a category of crimes is sufficiently dangerous to warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries. Section 189 cannot be read as attempting to conflate them, and in any event under *Enmund* and *Tison* it would be impermissible for a state legislature to declare all participation in broad classes of felony murders, such as burglaries or robberies, punishable by death without further inquiry into each

24

individual defendant's mental state. (See *Tison v. Arizona, supra*, 481 U.S. at p. 149; *Enmund v. Florida, supra*, 458 U.S. at p. 798.)[9]

Finally, the People note two case-specific features of the armed robbery here that they suggest demonstrate reckless indifference to human life. First, Matthews, Daniels, and Gardiner—but not Banks—were members of the same gang. An expert testified their gang included 750 members, divided into cliques. In a single line of testimony, the expert identified the primary activities of the entire gang as "narcotics sales, burglaries, robberies, shootings, attempted murders, murders, gun—carrying guns." No evidence indicated Matthews or his two confederates had ever participated in shootings, murder, or attempted murder, or even that any member of their clique had.[10]

This evidence does not materially distinguish this case from *Enmund* or bring it any closer to *Tison*. The evidence connecting Daniels and Gardiner personally to past acts of violence was so attenuated as to be essentially non-existent; as to Banks, the actual shooter, it was entirely nonexistent. The contrast with *Tison*, where the Tison brothers freed and armed Gary Tison, who had killed before in the course of a previous prison escape, is stark.

---

[9] *Tison* does not specify those few felonies for which any major participation would "necessarily exhibit[] reckless indifference to the value of human life." (*Tison v. Arizona, supra*, 481 U.S. at p. 158, fn. 12.) One could surmise a partial list of crimes the United States Supreme Court might agree on—say, the manufacture and planting of a live bomb. But we need not speculate. Even the Tisons' prison break of two convicted murderers was remanded, rather than treated as per se demonstrating the requisite reckless indifference. Plainly, armed robbery does not qualify. (See *id.* at pp. 147–150.)

[10] The only specific gang crimes the expert testified to were two firearm possession convictions committed by other members uninvolved in the instant robbery. (See § 186.22, subd. (e)(31) & (32).)

25

Second, the dispensary had a sally port, security cameras, and a guard. To get through the sally port, the robbers had a medical marijuana authorization; to deal with the guard and others, they brought zip ties to subdue employees. Gonzalez's coworkers testified they believed he was an unarmed guard, and there was no evidence Matthews believed otherwise, or even that he knew a guard would be present. Because nothing in the record reflects that Matthews knew there would be a likelihood of resistance and the need to meet that resistance with lethal force, the evidence failed to show Matthews "knowingly engag[ed] in criminal activities known to carry a grave risk of death." (*Tison v. Arizona, supra*, 481 U.S. at p. 157.)

The insufficiency of these details to distinguish *Enmund* aside, a larger consideration is at issue here. The actions of Earl Enmund, the Tison brothers, and countless other nonkiller felony murderers fall on a continuum, a spectrum of culpability. To ask whether there is any variation at all between Matthews's conduct and Enmund's is certainly relevant, but in doing so we do not simply assume Enmund's conduct represents a constitutional maximum, i.e., the most culpable one can be and yet still be constitutionally ineligible for death, such that *any* variation would move one into the death-eligible zone. Nationally, thousands of armed robberies occur each year; per *Enmund*, only roughly 1 in 200 results in death. (*Enmund v. Florida, supra*, 458 U.S. at p. 800, fn. 24.) If Enmund's actions represented the outer limit of conduct immune from death eligibility, *Tison* would have been an easy case. It was not. We do not view *Enmund* as defining a maximum for ineligibility for the death penalty, any more than we view the egregious actions of the Tison brothers as a constitutional minimum level of culpability for death eligibility.

Because on the evidence in the record no rational trier of fact could have found Matthews' conduct supported a felony-murder special circumstance, the jury's special-circumstance true finding cannot stand.

DISPOSITION

We reverse the Court of Appeal's judgment as to defendant Lovie Troy Matthews and remand for further proceedings not inconsistent with this opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Banks

_____

**Unpublished Opinion** NP opn. filed 8/29/13 – 2d Dist., Div. 2
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S213819
**Date Filed:** July 9, 2015

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Gail Ruderman Feuer


_____

**Counsel:**


Sharon M. Jones, under appointment by the Supreme Court, for Defendant and Appellant Leon Banks

Danalynn Pritz, under appointment by the Supreme Court, for Defendant and Appellant Lovie Troy Matthews.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm, Peggy Z. Huang, Keith H. Borjon and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Danalynn Pritz
3625 East Thousand Oaks Boulevard, Suite 182
Westlake Village, CA  91362
(844) 805-3262

Paul M. Roadarmel, Jr.
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2396