Filed 1/16/25  P. v. Valdez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS EDWARDO VALDEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B329272<br>(Super. Ct. No. 1284824)<br>(Santa Barbara County) |

Carlos Edwardo Valdez appeals the trial court's order, following an evidentiary hearing, denying his petition for resentencing pursuant to Penal Code section 1172.6 (former § 1170.95), concerning his 2010 first degree murder conviction. [1] Valdez contends, among other things, that the evidence is insufficient to support that finding.  We affirm.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 [substantial evidence review applies to section 1172.6 resentencing rulings].)

---

[1] All further statutory references are to the Penal Code.

*FACTS AND PROCEDURAL HISTORY*

This appeal concerns crimes committed in Santa Maria on a single day by "Northwest" criminal street gang members against "West Park" criminal street gang members. Northwest gang members discharged a firearm at an occupied motor vehicle, committed an attempted robbery of Jorge Zirate and three other West Park gang members, and then fatally shot Zirate. Northwest gang associates Ernesto Ruiz and Orlando Diaz participated in the crimes but later entered into plea agreements with the prosecution and testified at trial against fellow gang members Valdez and Issac Garza.

Valdez was convicted of first degree murder and attempted second degree robbery, with findings that a principal discharged a firearm causing death and that he committed the crimes to benefit a criminal street gang. (§§ 187, subd. (a), 189, 664, 211, 12022.53, subd. (e)(1), 186.22, subd. (b).)

*Discharge of a Firearm at an Occupied Motor Vehicle*

On September 1, 2008, the occupants of a Toyota Camry automobile pursued and fired a firearm at Ruiz as he drove in Santa Maria. Ruiz then sought the aid of his brother Javier, Garza, and Diaz to locate the automobile and "fight" its occupants. Javier drove his extended cab pickup truck and Garza, carrying a loaded .380 caliber firearm, sat in the backseat. When they saw the Camry automobile, Ruiz shouted, "Blast that fool." Garza then leaned out the window of the truck and fired toward the Camry automobile. The bullet struck and dented the side of Javier's truck, however. Garza fired the firearm only once because it jammed. Later forensic analysis established that the truck dent was consistent with a bullet strike from a .380 caliber firearm.

*Attempted Robbery of West Park Members and Murder of Zirate*

Later that day, Garza and Diaz looked for an undocumented immigrant to rob, because they believed that such a victim would be unlikely to report the crime. Garza, Valdez, Diaz, and Ruiz had committed similar robberies in the past using Garza's loaded firearm. Garza then called Ernesto Ruiz and asked him to drive. Valdez accompanied Ruiz when he picked up Garza and Diaz. Garza was carrying a .380 caliber firearm that, according to Diaz, was always loaded.

The evening of September 1, 2008, near Russell Street, Garza, Valdez, Diaz, and Ruiz encountered four young men, including Zirate, who by their dress and appearance appeared to be rival street gang members. Valdez spotted them first and informed the others. Garza called out a "barrio check" to learn their gang affiliation. The men said they belonged to the rival street gang, West Park. The Northwest gang members, wearing hoodies, bandanas, and gloves, left Ruiz's automobile. Garza drew his firearm, and at gunpoint, Diaz patted down a West Park gang member for money or valuables. Garza and Zirate exchanged "trash talk[]"–words that were not "friendly." Valdez carried a small baseball bat. Ruiz testified at trial that he had seen such a bat used in gang fights. Each Northwest member accosted one West Park member.

The four West Park gang members suddenly ran in different directions and the Northwest gang members gave chase. Diaz ran only a short distance when he heard a gunshot. He ran back to Ruiz's automobile as did Ruiz, Garza, and Valdez. As they drove away, Garza stated, "I think . . . [Zirate] dropped." Valdez was angry and stated, "[W]hat the hell" when a bullet

"flew right by him." Later, Garza advised Diaz to "[j]ust relax, act like nothing happened."

Following the confrontation and shooting, Ruiz drove the others, including Valdez, to find a robbery victim. They found a woman with a West Park member. Garza, Valdez, and Diaz left the vehicle to confront them. Garza and Diaz soon returned to the vehicle from where Garza then shot at the two people. Valdez later returned to the vehicle holding his small baseball bat.

Zirate died in the alley near his home. Doctor Robert Anthony, a forensic pathologist, performed an autopsy and found that a bullet penetrated Zirate's chest wall, lung, pericardium, and pulmonary artery. Anthony concluded that the wound was not survivable. He opined that the trajectory of the bullet was consistent with Zirate running as he was shot, and that the wound was inflicted at a "distant range." Police officers discovered an ammunition casing approximately 260 feet from Zirate's body.

On September 8, 2008, one week following Zirate's death, Santa Maria Police Officer Rudy Alvara stopped an automobile driven by Ruiz because Ruiz was speaking on a cell telephone while driving. Garza sat in the front passenger seat and Diaz sat in the backseat. Garza responded to Alvara that he was on parole and Ruiz responded that he was on probation. Following a search, Alvara found several pair of black gloves, bandanas, and a loaded .380 caliber firearm in the automobile. The firearm and one bandana were under Garza's seat. Later forensic analysis established that the ammunition casing found 260 feet from Zirate's body had been fired from the firearm discovered in Ruiz's automobile.

4

After his arrest, Diaz was housed at the Santa Barbara County jail. During his pretrial confinement, Diaz agreed to wear a recording device and share a jail cell with Valdez, who had been arrested the previous day. Diaz showed Valdez a fictional police report stating that a neighbor heard the gunshot and heard someone shout Valdez's moniker, "Slick." During their conversation, Valdez stated, "[T]his is all [Garza's] fault," and that Garza should "man up" to the crimes. Valdez asked Diaz to remind him whether they wore bandanas during the robbery. Diaz confirmed that they did. Later, police officers interviewed Valdez. When Valdez returned to the cell, he appeared "panicked," and stated that "the police were hitting [him] with the truth" but that he did not "admit to shit." At trial, the prosecutor played the recording of the jail conversation between Valdez and Diaz.

Diaz entered into a plea agreement with the prosecution in exchange for his promise to testify truthfully at trial. He also testified that he was disappointed that Garza did not "man up" to committing the crimes. Ruiz also entered into a plea agreement in exchange for his truthful testimony at trial.

At trial, the prosecutor presented evidence that Garza and Valdez were members of the Northwest street gang. The prosecutor also presented evidence of Valdez's social media page which contained the comment that "[West] Parkers all will be blasted on sight."

In 2010, the jury convicted Garza and Valdez of first degree murder and attempted second degree robbery. (§§ 187, subd. (a), 189, 664, 211.) The jury also found that Garza personally discharged a firearm causing death and that Garza and Valdez

committed the crimes to benefit a criminal street gang. (§§ 12022.53, subd. (e)(1), 186.22.)

The trial court sentenced Valdez to a prison term of 78 years to life. Valdez appealed and contended, among other arguments, that insufficient evidence supported his conviction of premeditated and deliberate murder as an aider and abettor or as a natural and probable consequence of aiding and abetting the attempted second degree robbery. We did not discuss the contention because the prosecutor had argued and the trial court instructed pursuant to then-existing law regarding felony murder committed in the course of attempted robbery. (*People v. Garza et al.* (Apr. 4, 2012, B228779) [nonpub. opn.].) We affirmed the judgment.

*Resentencing Petition*

On April 20, 2020, Valdez filed a section 1172.6 petition for resentencing. The trial court found that Valdez made a prima facie showing for relief, issued an order to show cause, and subsequently held an evidentiary hearing in accordance with section 1172.6, subdivision (d).

At the evidentiary hearing, the trial court received the evidentiary record of Valdez's 2010 trial into evidence. In addition, witnesses Laura Hernandez, Dan Cohen, Ernesto Ruiz, and Valdez testified.

Probation Officer Laura Hernandez testified that she interviewed Valdez in 2007, prior to the underlying crime. Valdez stated that West Park gang members harassed him and his family and that he had previously fought the gang members. He had thought of using his firearm against them but did not have sufficient ammunition.

Santa Maria Police Gang Detective Dan Cohen testified that he arrested Valdez in 2007 for pointing a firearm at and threatening to kill West Park gang members as they walked on a sidewalk. At the time of his arrest, Valdez had a tattoo ("Projects") that was common to Northwest gang members.

Ernesto Ruiz testified that Valdez accompanied him, Garza, and Diaz to the attempted robberies that evening. He stated that Valdez did not possess a weapon and was not near Garza at the time Zirate was shot.

Valdez testified that he was 18 years old and a Northwest gang member at the time of Zirate's murder. He stated that he accompanied Garza, Diaz, Ruiz, and other Northwest gang members that day as they drove to a clothing store. En route, they saw four West Park gang members. Except for him, all the occupants of the vehicle left the vehicle and chased the West Park gang members. Valdez drove the vehicle around the block and later picked up his fellow gang members.

Several hours later, Valdez and the other Northwest gang members drove to visit a female Northwest gang member. They saw Zirate on the street. Valdez remained behind but Garza, Diaz, and Ruiz chased Zirate. Valdez testified that he did not know that Garza was armed, did not see Zirate get shot, and was unaware of the killing. Valdez denied possessing a baseball bat or participating in any shooting or in any robbery that day.

The trial court denied Valdez's resentencing petition after concluding beyond a reasonable doubt that Valdez was a major participant in the attempted robbery who acted with reckless indifference to human life. The court specifically found that Valdez's testimony was not credible. The trial judge stated: "It is [an] inherently dangerous activity to be involved in a gang

7

confrontation, to have a gun involved, and then to [have] determined that the rival members are . . . not . . . allowed to escape without confrontation." In ruling, the trial court referred to the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788, 803.

Valdez appeals and contends that insufficient evidence supports the finding that he aided and abetted the killing or that he was a major participant in the attempted robbery who acted with reckless indifference to human life. He further contends that the trial court erred by failing to find that his youth reflected a lack of implied malice.

*DISCUSSION*

*I.*

Valdez argues that the trial court's ruling denies him due process of law pursuant to the federal and California constitutions because it does not rest upon sufficient evidence.

Section 1172.6 was enacted to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Schell* (2022) 84 Cal.App.5th 437, 442.) Section 189, as amended, now provides that in cases where a death occurs during the perpetration or attempted perpetration of a felony listed in section 189, subdivision (a), a person is liable for murder only if the person was the actual killer, the person acted with intent to kill in aiding, assisting, or soliciting the killer, or if the person "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); *Schell*, at p. 442.)

8

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270 [substantial evidence review following section 1172.6 evidentiary hearing]; *People v. Schell*, *supra*, 84 Cal.App.5th 437, 442 [same].) We do not redetermine the weight of the evidence or the credibility of witnesses. (*Ibid.*) " ' "Conflicts and even testimony . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Montanez*, at p. 270.)

The trial court's conclusion that Valdez was a major participant who acted with reckless indifference to human life in the attempted robbery is supported by substantial evidence. Valdez joined his accomplices in confronting the four West Park gang members and, indeed, he had pointed them out. Valdez carried a small baseball bat and Garza carried a firearm in his waistband. Valdez and his accomplices wore hoodies, bandanas, and gloves. Valdez had accompanied Garza to prior robberies where Garza was armed. On his social media page, Valdez urged that all West Park gang members be shot on sight. He informed his probation officer a year earlier that he had a firearm and thought of shooting West Park gang members but lacked ammunition. Cohen arrested Valdez in 2007 for threatening to shoot and kill West Park gang members as they walked on a sidewalk.

During the confrontation, Garza held the West Park men at gunpoint while each accomplice covered a West Park gang member. Diaz patted down one rival gang member for valuables. When two West Park men ran, Valdez was the lead in the chase to detain and confront them. Garza fired his weapon as he ran behind Valdez, so closely to Valdez that he complained. After Garza shot Zirate, neither he nor Valdez rendered aid or sought medical assistance for Zirate. Valdez left the area with his accomplices and later confronted another gang member. Garza shot at that gang member from Ruiz's vehicle. Valdez's presence at the attempted robbery scene, possession of a small baseball bat, participation in the attempted robbery and detention of the victims, companionship with his accomplices, Garza's "trash talk" during the attempted robbery, Valdez's long-harbored resentment toward West Park gang members and prior physical conflicts with them, and his social media declaration that West Park members should be shot on sight, all support the finding that Valdez was a major participant in the attempted robbery who acted with reckless indifference to human life. Unlike a garden-variety armed robbery, this attempted robbery involved a substantial and unjustified risk of harm to the West Park gang members. (*People v. Banks*, *supra*, 61 Cal.4th 788, 808 [" 'grave risk of death' " provides evidence of reckless indifference to human life].) The trial court properly considered Valdez's individual culpability and personal role in the crime leading to Zirate's death. (*Id.* at p. 803.)

## II.

Valdez argues that the trial court did not fully consider his youth in ruling on the section 1172.6 petition. He points out that he was 18 years old at the time of the underlying crime and

asserts that his youth precludes a finding that he was a major participant in the underlying crime who acted with reckless indifference to human life. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991 [insufficient evidence that 15 year old acted with reckless indifference to life in light of his youth]; *In re Moore* (2021) 68 Cal.App.5th 434, 451, 454 [defendant's youth is relevant in determining whether he acted with reckless indifference to human life].) Among other things, Valdez points to evidence of his frequent marijuana use, immaturity, impulsivity, and family background.

The trial court expressly considered Valdez's youth and concluded that this factor did not change its finding. Valdez was an 18-year-old seasoned Northwest gang member who had participated in prior robberies with an armed accomplice, had threatened and fought West Park gang members previously, and had announced in social media that West Park gang members would be shot on sight. The trial judge summarized that "it is hard to imagine that [Valdez] hadn't made the choice to engage in the conduct that he did, without regard . . . to the dangers to himself and to others." The court reasonably considered the youth factor and accorded it little weight in view of the totality of the evidence.

### III.

In view of our discussion, we need not decide whether there is substantial evidence that Valdez aided and abetted implied malice murder.

Valdez also claims the trial court's comments reflect a misunderstanding of "major participant" and "reckless indifference to human life." We review the court's ruling, not its reasoning, however. (*People v. Brooks* (2017) 3 Cal.5th 1, 39

11

[general rule].)  Moreover, in written argument, the prosecutor explained the felony murder factors set forth in *People v. Banks*, *supra*, 61 Cal.4th 788, 803, and *People v. Clark* (2016) 63 Cal.4th 522, 617.  The court also acknowledged the *Banks* factors in explaining its reasoning, stating that it went "through the Banks' factors."

The judgment is affirmed.

NOT TO BE PUBLISHED.



GILBERT, P. J.

We concur:



BALTODANO, J.



CODY, J.



12

Jed Beebe, Judge

Superior Court County of Santa Barbara

_____

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorney Generals, for Plaintiff and Respondent.