Filed 9/13/23  P. v. Yi CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B319845 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA081781) |
| v. | |
| JAE HEE YI, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

## I.    INTRODUCTION

Defendant and appellant Jae Hee Yi filed a petition for resentencing of his first degree murder conviction pursuant to former Penal Code section 1170.95.[1]  The trial court denied the petition, ruling that defendant was ineligible for resentencing because he was a major participant in the underlying robbery, burglary, and carjacking felonies and acted with reckless indifference to human life.  Defendant appeals, challenging only the court's reckless indifference finding.[2]  We affirm.

## II.    FACTUAL BACKGROUND

We recite evidence relevant to the issues on appeal from the prior opinion in this case (*People v. Yi* (B251560, Oct. 24, 2014) [nonpub. opn.])[3]:

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  Further references will be to the statute's current section number only.

[2]    Although defendant also argues in his opening brief that the court erred in finding he was a major participant, he conceded at oral argument that there was sufficient evidence to show that he was a major participant.

[3]    Neither party contends that the facts as recited in the prior appellate opinion do not accurately reflect the facts in the trial record in this matter and neither party adduced additional evidence at defendant's section 1172.6 hearing.  (See section 1172.6, subdivision (d)(3).)  Accordingly, we set forth relevant

2

"A.     The Prosecution's Case
     1.     Overview

"Summarized in a light most favorable to the judgment, the evidence was as follows.  Defendant was a member of a burglary conspiracy which targeted Indian families.  The perpetrators routinely stole cash, jewelry, electronics and vehicles.  During the present burglary, Panalal Shah was murdered.  Mr. Shah suffered blunt force trauma causing multiple bruises and abrasions, fractured ribs and vertebrae, and a fractured spine.  He was found with his hands and feet bound lying face down on his bedroom floor.  Defendant made admissions to his girlfriend, Jennifer Pasasouk, and an acquaintance, Josephine Chai.  Defendant admitted assaulting a man.  Defendant thought the man had died.

"2.     The evidence
"a.  December 4, 2007 burglary, murder, and carjacking
"On December 4, 2007, defendant and several accomplices burglarized a Diamond Bar home.  They entered the home after prying off a window screen at the back of the house.  They attempted unsuccessfully to access a safe inside an armoire.  Several tools, including a screwdriver, were left on the floor near the armoire.  Latex gloves were also left on the floor.  They were visible in the crime scene photographs.  And the victims' Mercedes was stolen.  There was evidence that subsequent to the burglary defendant had the key to the Mercedes in his possession and knew where it had been parked.  The Mercedes was later

_____

facts from the prior opinion, which we have independently confirmed from our own review of the record, as context for defendant's claims.

3

found in West Covina.  Boxes of latex gloves had been left in the vehicle.

"During the burglary, Mr. Shah was murdered.  The time of death was estimated at between 1 and 4 a.m.  Mr. Shah was found lying face down on his bedroom floor.  His hands and feet were bound with Christmas tree lights.  He had suffered multiple blunt force injuries.  He had multiple bruises and abrasions, fractured ribs and vertebrae and a thoracic spine fracture.  Two preexisting conditions may have contributed to Mr. Shah's death—osteoporosis, causing his bones to be weak and break easily, and coronary artery disease.  Dr. Juan Carrillo, a deputy medical examiner, testified at trial that Mr. Shah had a 50 percent narrowing of a major coronary artery.  A 50 percent narrowing of a major coronary artery decreases the blood flow to the heart.  Dr. Carrillo explained, 'In any situation of stress, the heart requires more oxygen, and this can deprive the heart of the oxygen it needs.'  Dr. Carrillo further explained that if an individual in Mr. Shah's condition were tied up, facedown, with no ability to move, death could ensue:  'The person's entire weight is on his chest and he will have difficulty breathing.  If he is unable to turn his body, even though his face may be uncovered, eventually he will tire out and will be unable to breathe, and die.'  Given that Mr. Shah's ribs had been fractured and vertebrae bruised and crushed, Dr. Carrillo concluded:  'With the injury to the spine, it would prevent his lower extremities from moving.  So any ability for him to try to turn and remove himself from this situation is gone; and, therefore, he'd remain on his chest.  [¶] Injuries to the ribs now compromise his ability to breathe.  He can't expand his chest very well with the fractured ribs.  On top of that, now he's facedown with his entire weight, so that further

4

decreases his ability to breathe.' If he remained in that position unattended for a period of time, he would die. Dr. Carrillo was unable to say whether a younger, healthier man with these injuries would have survived.

"Details of the crime were not made public. The location and the murder victim's name were disclosed. Information about the Mercedes was given only to law enforcement agencies.

"b.     Ms. Chai's January 9, 2008 arrest and interview

"On January 9, 2008, Ms. Chai was arrested on drug charges. Sergeant Randy Seymour interviewed Ms. Chai in custody the following day, January 10. Sergeant Seymour offered to 'walk' the charges against Ms. Chai if she told him who perpetrated the Shah burglary and murder. Ms. Chai said three people were involved. Defendant was one of them. Ms. Chai had seen defendant with two pieces of jewelry, presumably from the burglary. Ms. Chai thought the jewelry had since been sold. Ms. Chai told Sergeant Seymour she overhead defendant talking to her boyfriend. Ms. Chai refused to name her boyfriend. Her boyfriend was later identified as Steven Phong (Steven). The conversation occurred at around 4 a.m. the day of the murder: '[Defendant] was saying . . . that he wanted to get in the safe but he couldn't get in. He's saying that the [Mercedes is] somewhere.' With respect to the murder, Ms. Chai told Sergeant Seymour, '[A]nd I guess the old man came downstairs, into . . . the room, and [defendant] didn't get really into detail about [it] and I got the gist that something bad happened.' Ms. Chai said, '[They hurt the old guy because] [h]e was making noises.' Sergeant Seymour ended the interview after Ms. Chai continually refused to identify the perpetrators other than defendant.

5

"Ms. Chai later testified before a grand jury. She described defendant as a potentially violent person, 'I've seen [him] get angry with people that he thought were snitching on him.' She also testified, 'I have never seen him actually beat anybody up, but I have seen him hold a gun to somebody.' Ms. Chai also told the grand jury that on the morning following the Shah burglary, defendant had said to her, 'I think I killed somebody.' Defendant told Ms. Chai 'they' went to the Shah home because there was a safe, but they were unable to get into it. Defendant told Ms. Chai a man showed up downstairs. Defendant restrained the man who resisted. Ms. Chai testified to the grand jury: '[Defendant] said he went in the house and . . . I don't think that he knew that anybody would be home. But he went in the house, and the old man obviously showed up downstairs. And . . . he did say that he —he sub—I can't think of the word now, sub, where you just hold somebody down like—so that [they] can't move, like restraining him . . . and then the man resisted . . . and that's it. I don't think he knew that the man died.' Ms. Chai said 'they' took the man's black Mercedes and parked it somewhere. Defendant had the keys to the Mercedes.

"At trial, Ms. Chai testified her statements to Sergeant Seymour and her grand jury testimony were untruthful. Ms. Chai said she did not hear any information about the burglary from defendant. She had heard about the Shah burglary on the news and had read about it on the Internet. She had not spoken to defendant about the burglary at all. Ms. Chai said she had implicated defendant because she hated him. Ms. Chai testified, 'A lot of my testimony [before the grand jury] was because I had felt that [defendant] had robbed me when I was . . . dealing dope when I was on the streets.' Ms. Chai also testified she made the

6

untruthful statements because she wanted to get out of custody and she had been promised leniency. Ms. Chai told the grand jury what she thought the detectives wanted her to say.

"c.     The January 11, 2008 search pursuant to a warrant
     "On January 11, 2008, sheriff's investigators conducted a search of a home in Rowland Heights pursuant to a search warrant. Defendant lived in the home with Ms. Chai, Ms. Chai's boyfriend, Steven and her boyfriend's brother, Nelson 'Nate' Phong (Mr. Phong). Sergeant Seymour saw a Lexus automobile at the location. Also on January 11, 2008, detectives searched a Rancho Cucamonga residence pursuant to a search warrant. Defendant and his girlfriend, Ms. Pasasouk, had been staying in the home. Officers found what appeared to be stolen electronics and currency, including Indian currency.

"d.     Ms. Pasasouk's January 11, 2008 interview
     "Defendant's girlfriend, Ms. Pasasouk, was present during the Rancho Cucamonga search. Sergeant Seymour interviewed Ms. Pasasouk. The interview was recorded, but the recording was lost prior to trial. Ms. Pasasouk told Sergeant Seymour the following. Defendant made a living committing 'licks'—in other words, burglaries, robberies, thefts and drug dealing. Sergeant Seymour testified Ms. Pasasouk related the following, 'She said that [defendant] had come home one morning rather upset, and he told her that he thought he had just killed somebody.' Defendant said it happened during a burglary. The victim had been tied up and kicked. After that morning, defendant began committing burglaries about once a week. Defendant told Ms. Pasasouk he lost a cellular telephone during one of those

7

subsequent burglaries.  He left it in a car that was abandoned at the burglarized home.

"e.      Defendant's and Ms. Pasasouk's January 14, 2008 arrests and subsequent interviews

"Defendant and Ms. Pasasouk were both arrested at a Fullerton hotel on January 14, 2008.  This was a few days after Ms. Pasasouk spoke with Sergeant Seymour.  Ms. Pasasouk was charged as an accessory to murder.  Male and female clothing and toiletries were in the hotel room together with a laptop computer, a small amount of methamphetamine, and more than $10,000 in cash.  The laptop appeared to be relatively new.  It contained pictures of an Indian family.  It also contained a folder labeled 'Pasadena.'  The folder held the names, addresses and telephone numbers of four Indian families in Pasadena.  During booking, defendant said he was known by a moniker.

"Sergeant Seymour interviewed Ms. Pasasouk in custody the day following her arrest.  The jury heard a recording of that interview.  Ms. Pasasouk repeated that defendant thought he had killed someone.  She said defendant felt bad about it.  Defendant knew he was wanted for murder.  Ms. Pasasouk told Sergeant Seymour:  '[Defendant] just told me that he tied up the person, he held down the person:  he tied the person; he kicked them, it was a couple of times.  But then . . . after that, you know, he didn't know if the man had a heart attack or not.  But he was saying that he probably had a heart attack 'cause he stopped moving.'  According to Ms. Pasasouk, defendant's accomplices were Mr. Phong and John Smiles.  Ms. Pasasouk overheard Mr. Phong and defendant talking.  They had not known Mr. Shah would be home.  They knew Mr. Shah had died, but they did not know

whether he had suffered a heart attack.  They also said that Mr. Smiles had 'fucked up.'

"Ms. Pasasouk testified at trial under a conditional grant of immunity.  Ms. Pasasouk admitted she told Sergeant Seymour the foregoing.  She denied, however, that it was true.  Ms. Pasasouk testified Sergeant Seymour gave her information about the burglary and told her to repeat it.  Sergeant Seymour said if she implicated defendant, her children—who had been detained by the Department of Children and Family Services—would be returned to her.  Ms. Pasasouk testified she only told Sergeant Seymour what he wanted to hear so that she could reclaim custody of her children.

"Sergeant Seymour also interviewed defendant.  The interview occurred on the day following defendant's arrest.  The recorded interview was presented to the jury.  Defendant admitted he was known by a particular moniker.  At first defendant claimed he only held property stolen by others.  Eventually, defendant admitted that he burglarized houses.  He denied he had ever killed anyone.  Defendant asserted he was only the driver and lookout; he was not the one who set up the burglaries.  Defendant admitted driving to seven or eight burglaries including in Corona, Anaheim Hills, Hidden Hills, Hacienda Heights or La Puente, Boyle Heights and Rowland Heights.  Defendant specifically acknowledged his participation in [another burglary,] the Corona burglary:  '[Defendant]:  Well, Corona's just—which one's Corona?  [¶]  [Sergeant Seymour]:  Corona's the one where you almost got caught.  [¶]  [Defendant]:  Oh, okay.'  Defendant admitted a cellular telephone found at the Corona location was his:  '[Defendant]:  And the phones.  Honestly, only one of them was mine.'  Defendant and his co-

9

perpetrators repeatedly stole cash, electronics, jewelry and cars, including a Lexus, a Maxima and a Honda Accord. Defendant named Steven, John Smalls, 'Keith,' and '[a] guy named Bethos' as among the perpetrators of the multiple burglaries. Mr. Smalls handled the jewelry and sold it in Orange County. Defendant said Steven got caught with the Lexus. Defendant remembered Steven and 'Joseph' driving the Lexus. Defendant also told Sergeant Seymour he had left the Corona residence just before the detectives arrived. As a result, defendant's accomplices thought he had 'snitched.' Just after midnight, a text was sent to the cellular telephone defendant had left behind. The text said: 'Where in the hell r u at? dont even tell me that u knocked out wherever the fuck u at n dont expect me not to trip if u did, so call me from ur other phone[.]'

"Sergeant Seymour told defendant Ms. Pasasouk had been arrested. Only then did defendant admit his participation in the Diamond Bar burglary. Defendant said there were four perpetrators—defendant, Mr. Smalls, 'Bethos,' and an otherwise unidentified Asian man. They gained entry at the rear of the residence. The burglars had been told there was $60,000 cash in the house. Defendant said the burglars knew Mr. Shah would be present: 'It was done, it was done out of—it was—they knew that person was in the house. Know what I mean?' Defendant said he had been waiting outside in his truck but was summoned inside the Shahs' house. The other burglars wanted defendant to tie up Mr. Shah. The burglars inside the residence wanted Mr. Shah placed in defendant's truck: 'And they call . . . they wanted me at first, they wanted me to get the body and load it up. I'm like, fuck, no, man. I ain't touching that body, man. You know, like—

10

you call me in the house to load it up?  No, man.  Know what I mean?'

"At one point, defendant seemed unsure whether Mr. Shah's abduction or murder was an objective of the burglary: 'They wanted me to tie and take him to the car.  . . . I don't know if this was the job . . . if this is the reason why we came to the house for.'  Defendant said: '[L]ike they're like trying, trying to hold somebody down, whatever.  But like, it looked like—the guy wasn't even—they [wanted to] put him in the truck.'  Upon entering the residence, defendant saw the armoire on the bedroom floor and Mr. Shah was 'mostly on the floor.'  Someone was holding Mr. Shah down.  Mr. Shah was alive and moving.  He was not tied up.  Mr. Shah was on his knees by the bed with his torso laid out across the bed.  It looked like there was a sheet over him.  (As Sergeant Seymour later testified, Mr. Shah was wearing a 'lungee'—a linen wrap worn by Indian men.  That information had never been disclosed to the public.)  Defendant did not know who subsequently tied Mr. Shah's feet and hands: 'But like—the last time I know—like I know somebody—I don't know who tied him up.  I really don't know that part, sir.  Tied up or not.  But I heard—I know that he was trying to resist or something, and somebody just—you know what I mean— whacked him.  But he didn't like, uh, I guess whacked to the head or anything.  It was just, be quiet.  You know what I mean?  Type of thing.'  Defendant left the house and returned to his truck where he waited.  Defendant saw someone drive the Shahs' Mercedes out of their garage.

"Sergeant Seymour testified it was defendant who first mentioned the Mercedes.  Defendant also told Sergeant Seymour, '[T]he [Shahs'] son or somebody either owned or worked at a hotel

11

or motel.' In fact, the Shahs did own a hotel in Colorado and their son did work there. Further, defendant's description of Mr. Shah's fatal beating was consistent with Mr. Shah's injuries. During the interview, defendant, who was nervous, expressed fears for his safety and that of his family and Ms. Pasasouk. Sergeant Seymour testified, 'He was fearful that if he gave names of certain individuals, especially one name in question, that that could have repercussions on his safety.' During the conversation, defendant asked if efforts could be taken to protect Ms. Pasasouk. Sergeant Seymour testified defendant expressed concern about protecting Ms. Pasasouk from a specific Latino gang. Sergeant Seymour was asked to describe the structure of the gangs in this state. After referring to the gang mentioned by defendant, Sergeant Seymour testified: 'You have Southern California Hispanic gangs. Depending on who you are talking to and the context you are talking to, Hispanic gangs can go into a larger or more organized group, leading up to, and who I believe he was eventually talking about was the Mexican Mafia.'" (*People v. Yi, supra*, B251560.)

The prosecution also presented DNA forensic and uncharged burglaries evidence that does not bear on the issue in this appeal, that is, whether defendant's actions in connection with the Diamond Bar robbery, burglary, and carjacking showed a reckless indifference to human life.

"B.    The Defense Case"

Defendant presented cellular forensic, DNA forensic, and false confession evidence that does not bear on the issue in this appeal: i.e., whether defendant's actions in connection with the Diamond Bar robbery, burglary, and carjacking showed a

reckless indifference to human life. (*People v. Yi, supra,* B251560.)

## III.   PROCEDURAL BACKGROUND

A.   *Defendant's Conviction*

The trial court instructed the jury on principals (CALJIC No. 3.00), direct aiding and abetting (CALJIC No. 3.01), natural and probable consequences (CALJIC No. 3.02), murder (CALJIC No. 8.10), malice aforethought (CALJIC No. 8.11), first degree felony murder (CALJIC No. 8.21), first degree felony murder— aider and abettor (CALJIC No. 8.27), and special circumstances— murder in commission of a robbery or burglary (CALJIC No. 8.81.17).

The jury convicted defendant of first degree murder. (§ 187, subd. (a).)  It found he committed the murder while engaged in the commission of a robbery, burglary, or carjacking. (§ 190.2, subd. (a)(17).)  The jury also convicted defendant of first degree in concert robbery (§§ 211, 213, subd. (a)(1)(A)); first degree residential robbery (§ 211); carjacking (§ 215, subd. (a)); and first degree burglary with another person present.  (§§ 459, 667.5, subd. (c)(21).)  The trial court found defendant had a prior serious felony conviction within the meaning of sections 667, subdivisions (a)(1) and (b) through (i), and 1170.12.  It further found defendant had served two prior prison terms within the meaning of section 667.5, subdivision (b).  The court sentenced defendant to life without the possibility of parole plus five years. The court stayed imposition of the section 667.5, subdivision (b) enhancements.  (*People v. Yi, supra,* B251560.)

13

B.    *The Prior Appellate Decision*

Defendant appealed from his convictions.  A prior panel of this division upheld defendant's convictions, but reversed the trial court's order staying the section 667.5, subdivision (b) enhancements and remanded for the court to exercise its discretion whether to impose or strike those enhancements. (*People v. Yi, supra*, B251560.)

In connection with defendant's claim that the trial court erred in denying his request that it instruct the jury on major participant and reckless indifference concepts regarding the special circumstance allegation, the prior panel concluded the court erred, but that the error was harmless because there was "overwhelming evidence" that defendant was a major participant who acted with reckless indifference to human life.[4]  (*People v. Yi, supra*, B251560.)

C.    *Defendant's Section 1172.6 Petitions*

On July 6, 2021, defendant filed a section 1172.6 petition for resentencing.  The matter was assigned to the Honorable Bruce F. Marrs, who presided over defendant's trial.  On December 21, 2021, the trial court (Judge Marrs) found that defendant made a prima facie case and issued an order to show cause.  On December 27, 2021, defendant filed a second section 1172.6 petition for resentencing, adding, among other allegations,

---

[4]    The court rendered its opinion prior to the California Supreme Court's major participant and reckless indifference analyses in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

14

the allegation that he "was not a major participant in the felony **or** [he] did not act with reckless indifference to human life during the course of the crime or felony." Without objection from the parties, the court consolidated the two petitions.

At the March 29, 2022, hearing on defendant's section 1172.6 petition, the trial court stated it had reviewed the abstract of judgment, charging documents, preliminary hearing transcript, trial transcript, jury instructions, and the prior opinion, all of which it admitted into evidence. As noted above, neither party presented new or additional evidence.

At the conclusion of the hearing, the trial court denied defendant's petition for resentencing. It found, beyond a reasonable doubt, that defendant was a major participant in the underlying felonies and had acted with reckless indifference to human life.

The trial court explained the evidence showed defendant "help[ed] to hold the victim down, assisting and facilitating, tying up the victim. . . . He clearly participated in beating the victim." As a result of the beating, Mr. Shah suffered "fractured vertebra, ribs, [and] spine." Defendant noted that after the beating, Mr. Shah stopped moving and defendant left the scene having made "absolutely no attempts to help [Mr. Shah] at all. No attempts to stop anybody else. No attempt to summon . . . help. He admitted that he had seen the situation, understood what was going on, understood [Mr. Shah's] condition, and with the co-defendants, participated in the assault, both in intent and in action."

The trial court further explained that defendant was "not a mere bystander when it came to the deadly force used during the robbery. He was clearly aware of the risk of death or great bodily

15

injury once the robbery was underway.  There is strong evidence that he knew or should have known from the start that the way the co-defendants were treating [Mr. Shah] that he was likely to be killed during the robbery, and his actions played a role in that murder.  [¶]  Therefore, substantial evidence supports the conclusion that . . . [defendant] acted with reckless indifference to human life, and he expressed total indifference by behaviors whether his cohorts used deadly violence.  As I said, he did nothing to aid [Mr. Shah] and did nothing to minimize the risk of violence when it became clear that things were not as planned in the original proceedings.”

## IV.   DISCUSSION

Defendant contends that insufficient evidence supports the trial court’s finding that the prosecution proved beyond a doubt that he acted with reckless disregard for human life in the robbery, burglary, and carjacking.  We disagree.

A.   *Standard of Review*

“We review the trial court’s factual findings for substantial evidence.  [Citations.]  ‘[W]e review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.’  [Citation.]  ‘“We resolve neither credibility issues nor evidentiary conflicts . . . .”  [Citation.].’  [Citation.]”  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

B.    *Senate Bill 1437*

"Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability.  Senate Bill 1437 also adds . . . section [1172.6], which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' (§ [1172.6], subd. (a).)

"An offender may file a petition under section [1172.6] where all three of the following conditions are met:  '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;]  [¶]  (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;]  [¶]  [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to [s]ection[s] 188 or 189 made

17

effective January 1, 2019.' (§ [1172.6], subd. (a)(1)–(3).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

C.      *Reckless Indifference to Human Life*

"'[T]he culpable mental state of "reckless indifference to life" is one in which the defendant "knowingly engag[es] in criminal activities known to carry a grave risk of death" [citation]. . . .' (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) 'The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' (*Banks, supra*, 61 Cal.4th at p. 801.) '[I]t encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' (*Clark, supra*, 63 Cal.4th at p. 617.)" (*In re Loza* (2017) 10 Cal.App.5th 38, 51–52.)

Among the relevant factors to consider in determining whether a defendant acted with reckless indifference to human life are:  (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of the violence during the felony.  (*Clark, supra*, 63 Cal.4th at pp. 618–623.)  No one of the factors for determining reckless indifference "'is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Id.* at p. 618.)

1. <u>Knowledge of weapons, and use and number of weapons</u>

The prosecution did not present evidence that any of the perpetrators was armed. Accordingly, this factor does not support the trial court's finding of reckless indifference to human life.

2. <u>Physical presence at the crime and opportunities to restrain the crime and/or aid the victim</u>

Presence is important to culpability because it allows a defendant to observe his cohorts' actions and demeanor and determine whether their behavior tends to suggest a willingness to use lethal force. (*Clark, supra*, 63 Cal.4th at p. 619.) Presence also provides a defendant opportunities to act as a restraining influence on his cohorts and to render aid to a wounded victim. (*Ibid.*)

Defendant admittedly was present for Mr. Shah's beating and so was in a position to stop the beating or assist Mr. Shah. There is no evidence that defendant attempted to intervene or render aid to Mr. Shah. Instead, the evidence shows that the burglars knew Mr. Shah would be present, and when he "showed up downstairs," defendant restrained him, tied him up, and kicked him. Mr. Shah "resisted" and "was making noises" so the perpetrators "hurt the old guy." Mr. Shah was found lying face down. His hands and feet were bound and he had multiple blunt force injuries—multiple bruises and abrasions, fractured ribs and vertebrae, and a thoracic spine fracture. Defendant's participation in Mr. Shah's beating was such that he confessed to

19

Chai and Pasasouk that he thought he had killed Mr. Shah. Defendant told Pasasouk that he believed Mr. Shah might have suffered a heart attack—i.e., he believed Mr. Shah was in immediate medical peril—but he did not render assistance or call for aid.

The evidence concerning defendant's physical presence and actions at the scene strongly weighs in favor of the trial court's finding of reckless indifference to human life.

### 3. Duration of the felony

"Where a victim is . . . restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) No direct evidence was adduced concerning the amount of time the perpetrators were in the Shah home. Circumstantial evidence, however, suggests the robbery, burglary, and carjacking took place over an extended period of time. According to defendant, while his cohorts entered the Shah home looking for a safe that contained $60,000, he waited outside in his truck. Having found the safe, defendant's cohorts unsuccessfully attempted to open it. At some point, defendant's cohorts summoned defendant inside the Shah home and requested that he tie up Mr. Shah and place Mr. Shah in defendant's truck. Defendant refused. Thereafter, defendant's cohorts tied up Mr. Shah, Mr. Shah resisted, and "somebody" beat Mr. Shah. Later still, "someone" drove away in Mr. Shah's Mercedes. Crime scene photographs support the conclusion that the offenses committed in the Shah home occurred over an extended period of time as various areas, including the bedroom

in which Shah was killed, a closet, and the family room, had been ransacked. The evidence of duration supports the trial court's conclusion that defendant exhibited reckless indifference to human life.

### 4. Defendant's knowledge of cohorts' likelihood of killing

The prosecution did not present evidence that defendant's cohorts had a propensity for violence or that defendant was aware of such a propensity. The prosecution did, however, present evidence that defendant was fearful of identifying his cohorts to Sergeant Seymour because he believed at least one of his cohorts was a member of a Hispanic gang that had ties to the Mexican Mafia. The record is unclear whether defendant learned of that cohort's gang membership before or after the crimes at the Shah home.

The evidence concerning this factor neither increases nor decreases defendant's culpability.

### 5. Defendant's efforts to minimize the risks of the violence during the felony

From the evidence presented at trial, there is no evidence that defendant took steps to minimize the risks of violence during the robbery, burglary, and carjacking. Rather, defendant actively participated in a home invasion robbery, burglary, and carjacking knowing that someone was home and actively participated in the violence against Mr. Shah. Accordingly, this factor increases defendant's culpability.

21

Considering the totality of the circumstances from the evidence presented at defendant's trial (*Banks, supra*, 61 Cal.4th at pp. 801–802) and the factors identified in *Clark, supra*, 63 Cal.4th at pages 618 through 623, we conclude there was sufficient evidence that defendant acted with reckless indifference to human life.

## V.    DISPOSITION

The order denying defendant's section 1172.6 petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


I concur:



MOOR, J.

22

The People v. Jae Hee Yi
B319845


BAKER, Acting P. J., Dissenting



The opinion for the court holds a finding of reckless indifference to human life can rest solely on two facts: presence at the crime scene and the failure to render aid to a victim who is killed by others.[1]  We know this because the majority concedes (1) none of the perpetrators of the crime were armed with any weapons, (2) there was no direct evidence concerning the amount of time the perpetrators were in the victim's home, and (3) the prosecution presented no evidence about defendant's knowledge of the other perpetrators' propensity for violence.

The majority's holding is mistaken for two reasons.  First, the majority's opinion does not engage with the actual record of defendant's trial, instead block quoting for pages this court's prior opinion on direct appeal—which issued before our Supreme Court identified the pertinent factors to consider in *People v. Banks* (2015) 61 Cal.4th 788, *People v. Clark* (2016) 63 Cal.4th 522, and *In re Scoggins* (2020) 9 Cal.5th 667.  Proceeding in this fashion, the majority avoids the need to acknowledge ambiguities and deficits in the record, particularly with respect to what defendant himself knew and did while the crime was actually

---

[1]     No matter what the majority's opinion might suggest, there is no evidence that permits concluding defendant and appellant Jae Yi (defendant) was victim Panalal Shah's actual killer—that is why a reckless indifference analysis is necessary.

underway (as opposed to what others claimed defendant said after the fact). (Compare *Scoggins*, *supra*, at 683 ["Determining a defendant's culpability under the special circumstances statute requires a fact-intensive, individualized inquiry"].) Second, the majority does not heed our Supreme Court's admonition that we must consider "the totality of the circumstances" (*Scoggins*, *supra*, at 677) to determine whether defendant was aware of and willingly involved in the violent manner in which the offense was committed while consciously disregarding "the significant risk of death his . . . actions create[d]" (*Banks*, *supra*, at 801). Defendant's physical presence at the crime scene in this case (he told investigators he was called in to the victim's home by the other perpetrators after initially remaining outside) does not provide strong evidence of a recklessly indifferent mental state, and a failure to render aid to the victim is a fact that will be present in all but the most exceptional crimes.

Our Supreme Court has already said much about the evidence that is relevant to a reckless indifference to human life inquiry. But at some point, more may need to be said about how courts should make analytical use of the factor that requires consideration of whether a defendant had the opportunity to restrain the crime or aid the victim. Otherwise, we will get more opinions like today's that use the nearly omnipresent failure to render aid as a basis to deny Penal Code section 1172.6 relief so long as there is some other consideration that might be said to weakly support a reckless indifference finding.



BAKER, Acting P. J.



2