Filed 5/24/24  P. v. Harper CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C098128 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STK-CR-FE-1995-0006533 & SC058713A) |
| v. | |
| LARRY TYRONE HARPER, | |
| Defendant and Appellant. | |

In 1995, defendant Larry Tyrone Harper and four others armed with handguns and a shotgun murdered Prince A. in the course of an attempted robbery.  Prince A. was killed by a slug from a shotgun wielded by one of the men, Constanty Boyse.  In 1997, defendant pleaded guilty to second degree murder and admitted the allegation that he was armed with a firearm.  The trial court sentenced defendant to 16 years to life.  In 2019,

1

defendant filed a petition for resentencing under Penal Code section 1172.6.[1] The trial court denied the petition after holding an evidentiary hearing. We reversed that decision because the trial court appeared to rely on inadmissible hearsay and remanded for a new hearing in light of Senate Bill No. 775 (2021-2022 Reg. Sess.), which became law after the trial court ruled on defendant's petition.[2] On January 23, 2023, the trial court held a new evidentiary hearing, and on March 13, 2023, again denied defendant's petition.

On appeal, defendant asserts the trial court erred in denying his petition because there was insufficient evidence that he exhibited reckless indifference to human life. We find that substantial evidence supports the trial court's finding that defendant acted with reckless indifference to human life. Accordingly, we will affirm.

---

[1] Undesignated statutory references are to the Penal Code. Defendant filed his petition under former section 1170.95. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 without substantive changes. (Stats. 2022, ch. 58, § 10.) We cite to section 1172.6 throughout this opinion.

[2] In Senate Bill No. 775, the Legislature modified the evidentiary hearing provisions of section 1172.6. Effective January 1, 2022, subdivision (d)(3) of section 1172.6 provides that the Evidence Code applies at the hearing, meaning that "absent some exception, hearsay contained in probation, presentence reports, appellate opinions/order, and other documents, are not now admissible at a section [1172.6] hearing." (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1026.) In addition, subdivision (d)(3) of section 1172.6 specifically provides that any hearsay testimony admitted at a preliminary hearing under Proposition 115, the Crime Victims Justice Reform Act, as codified in subdivision (b) of section 872, "shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6, subd. (d)(3).) Thus, we consider only testimony at the preliminary hearing that is admissible under current law and disregard testimony admitted under Proposition 115 unless subject to a hearsay exception. (*People v. Patton* (2023) 89 Cal.App.5th 649, 652, fn. 2, review granted June 28, 2023, S279670, case fully briefed.)

# I

# BACKGROUND

The evidence the trial court considered at the January 23, 2023, evidentiary hearing consisted of the preliminary hearing transcripts and the transcript of defendant's interview by a police officer, which the officer largely recapitulated in his testimony at the preliminary hearing.

Viewed in the light most favorable to the trial court's decision, the transcripts establish that on the night of January 10, 1995, William Johnson and Tyrone Harris approached defendant in the parking lot of an apartment complex, gave him some rock cocaine, and asked him if he wanted to be involved in a robbery of Gregory's Private Social Club, known as the "Gambling Shack."

Defendant smoked between an "eight ball" and a half-ounce of rock cocaine daily. At this level of consumption, defendant could function normally and think clearly.

Defendant knew Johnson and Harris as drug dealers. He also knew that Johnson and Harris were members of the Broadway Crips street gang. Defendant himself had been a member of a Bloods street gang since he was 15 years old. Defendant met Harris in prison.

The plan Johnson and Harris proposed was for a group of men to arm themselves and rob the patrons of the Gambling Shack the next day, January 11, 1995. Besides Johnson and Harris, the others involved were defendant, Boyse, and Correll Thomas. Boyse and Thomas were also members of the Broadway Crips gang.

On the day of the robbery, defendant carried a .38-caliber snub-nosed revolver that Harris gave defendant at Harris's apartment where they met before going to the Gambling Shack. Defendant loaded the gun and put it in his pocket. Boyse had a 12-gauge pump action shotgun with a sawed-off barrel that belonged to Johnson. According to defendant, it was loaded with five "rifle slugs." Thomas had a nine-millimeter semiautomatic pistol. Harris and Johnson were usually armed. Harris normally carried a

3

.25-caliber semiautomatic handgun or a .357-caliber revolver. Johnson always had a .38-caliber semiautomatic handgun.

At about 6:00 p.m. on January 11, 1995, defendant, Johnson, Boyse, and Thomas left for the Gambling Shack. Defendant put the shotgun in the trunk of the car of a man named Moses, who gave them a ride. According to defendant, Moses knew nothing of the robbery plan. Harris was already at the Gambling Shack to check it out. On the road, they dropped off Johnson, who walked the rest of the way. When they arrived at a location near the Gambling Shack, defendant got the shotgun out of the trunk and gave it to Boyse, who carried it down his pants leg.

Harris and Johnson were inside the Gambling Shack, while defendant, Boyse and Thomas waited outside. Harris and Johnson had thought the door would be open for the men to enter and rob the patrons, but it was locked. The Gambling Shack had exterior and interior doors. The exterior door was in a recess or alcove and the interior door was a steel grate operated electronically. After 30 to 45 minutes Johnson came out, followed by Harris 10 minutes later. They suggested waiting for Prince A., the victim, to come out to rob just him. Johnson and Harris reported that Prince A. had been winning and was carrying $2,300.

After Harris went back in, defendant, Boyse, and Thomas waited approximately one hour and 45 minutes for Prince A. to come out. One of the vehicles parked in front of the Gambling Shack belonged to Prince A. The plan was to pull him out of his car, put him up against the wall, and take everything out of his pockets.

Prince A. eventually emerged alone and went to his car door. Taylor was supposed to grab Prince A. but did not. Boyse approached with the shotgun raised it to his shoulder and told Prince A. not to move. Prince A. ran. Thomas fired a shot from his nine-millimeter handgun at Prince A. When Prince A. reached the sidewalk, Thomas fired three more shots. When Prince A. made it to the street, Thomas fired two more shots. Prince A. continued to the corner of an intersection and tried to hide behind a telephone

4

pole. Thomas shot one more time. Then Boyse shot Prince A. with the 12-gauge shotgun. Prince A. started to fall backwards.

Defendant ran to a nearby slough. On the way, he saw a shotgun shell on the ground and attempted to pick it up because it had his fingerprints on it. Defendant got to his apartment and waited outside for the others, who arrived in a car.

At 8:07 p.m. on January 11, 1995, a Stockton police officer dispatched to the scene found Prince A. lying on the ground at the corner occupied by Gregory's Private Social Club. Prince A. had $2,464 in his pockets. He died that night at the hospital of a gunshot wound to the chest. A 12-gauge slug was lodged in his spine.

On the night of the attempted robbery, Boyse had a problem with the shotgun. It jammed when he cocked it. The next day, Johnson told defendant that there was something wrong with the shotgun. Defendant looked the gun over, and then took it to a park late at night, test-fired it, and gave it back to Johnson.

Defendant had known Prince A. for 10 years. He was a friend of defendant's uncle. In the police interview, defendant said of Prince A., "I set him up. I just set him up. I didn't shoot him."

Considering the above-described evidence, the briefing, and oral argument, the trial court determined beyond a reasonable doubt that defendant was a major participant who had acted with reckless indifference to human life.

II

DISCUSSION

A.    *Legal Background*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018,

5

ch. 1015, § 1, subd. (f).) Relevant here, the bill amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if that participant was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subd. (e)(3); accord, *People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).)

Senate Bill No. 1437 also added former section 1170.95 (renumbered as § 1172.6) (Stats. 2018, ch. 1015, § 4), which provides a petition procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Curiel, supra*, 15 Cal.5th at pp. 449-450.)

If the trial court determines the defendant has made a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause and conduct an evidentiary hearing. (*Curiel, supra*, 15 Cal.5th at p. 450; accord, § 1172.6, subds. (c), (d)(1).) At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." ( § 1172.6, subd. (d)(3).)

At the evidentiary hearing, the prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. (§ 1172.6, subd. (d)(3).) The trial court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) As mentioned, under the amendments made by Senate Bill No. 775, the admission of evidence at the hearing is governed by the Evidence Code, and hearsay admitted at the preliminary hearing is admissible only under an exception to the hearsay rule. (§ 1172.6, subd. (d)(3).)

We review a trial court's denial of a section 1172.6 petition for substantial

6

evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under the substantial evidence standard, we review the record " ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*)

B.      *Application*

Defendant does not dispute that he was a major participant in the robbery but asserts that the trial court's determination that he acted with reckless indifference to human life is not supported by substantial evidence. We disagree.

The California Supreme Court provided guidance on the "reckless indifference" element of felony murder in *People v. Clark* (2016) 63 Cal.4th 522, and also in the court's decision in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), which focused on the "major participant element."[3] "The reckless indifference considerations ' "significantly overlap" ' with the major participant considerations, ' "for the greater the defendant's participation in the felony murder, the more likely he acted with reckless indifference to human life." ' " (*People v. Nieber* (2022) 82 Cal.App.5th 458, 478, quoting, *People v. Clark, supra*, 63 Cal.4th at p. 615.) Relevant here, *Banks* held that knowing participation

---

[3]     *Banks* identified a series of considerations to help guide the inquiry into whether a defendant is a major participant: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.) The high court explained that none of these considerations is dispositive, and "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid.*)

7

in an armed robbery, standing alone, is insufficient to establish a defendant's reckless indifference to human life. (*Banks, supra*, 61 Cal.4th at pp. 807-811.)

Whether substantial evidence supports a finding of reckless indifference to human life is a case-specific inquiry. We look at the totality of the circumstances to determine whether there is substantial evidence defendant " ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' " (*Banks*, *supra*, 61 Cal.4th at p. 801; *In re Loza* (2017) 10 Cal.App.5th 38, 55 [the totality of the circumstances supported the reckless indifference finding].)

In *Clark*, the Supreme Court held " 'reckless indifference' . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*People v. Clark, supra*, 63 Cal.4th at p. 617.) As in *Banks*, the court "set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*People v. Strong* (2022) 13 Cal.5th 698, 706; see also *Clark*, at pp. 618-623.)

Viewing the entirety of the felony-murder transaction, we find substantial evidence that defendant acted with reckless indifference to human life. Defendant knew that all his confederates were armed with firearms. (See *People v. Owens, supra*, 78 Cal.App.5th at p. 1024.) He loaded his own gun, knew the type and caliber of each gun that the others carried, and the specific ammunition loaded in the shotgun. The plan required that all five of them carry firearms in order to rob the patrons of the Gambling Shack. In addition, the uncertainty involved in a group of individuals robbing everyone at an illegal gambling establishment, where one or more of the armed robbers might turn to violence or the victims might respond with violence, increased the risk that someone would be killed. (*Ibid.* ["Th[e] robbery posed a particularly high risk of violence because

8

it involved multiple robbers with loaded firearms taking over a bank during normal business hours when approximately 20 people were present"].)

One of the weapons, a pump action 12-gauge shotgun, sawed-off for concealment purposes, was particularly lethal, given that, as defendant knew, instead of buckshot it was loaded with five rifle slugs, one of which killed Prince A. (Wallace, *"Assault Weapon" Lethality* (2020) 88 Tenn. L.Rev. 1, 51 ["The kinetic energy of a typical twelve-gauge shotgun slug is around 2600 ft/lbs., which approximates the energy of larger caliber rifle bullets"].)

Defendant was not only physically present at the scene; he waited for over an hour with Thomas and Boyse for Prince A. to come out in order to rob him at gunpoint. Defendant does not report any conversation with his confederates during that time to limit the use of guns, i.e., to brandish but not fire the weapons. While the actual shooting took place in a short period of time, Thomas fired multiple shots in separate bursts as Prince A. tried to escape, but defendant did not say or do anything to restrain Thomas or Boyse when it became clear that the plan to brace Prince A. against a wall and empty his pockets had failed. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 [the interval between rounds of shooting gave defendant a chance to tell his brother to stop shooting or call off the plan].) Defendant did not report doing anything to protect Prince A., the designated victim, even though Prince A. was his uncle's friend, whom defendant had known for 10 years. (*Ibid.*) Quite the opposite, as defendant admitted to the police officer, defendant "set [Prince A.] up," even if he did not shoot him.

Defendant saw Prince A. fall after Boyse fired the shotgun, but defendant did nothing to aid Prince A. and instead fled to avoid capture. Courts have considered failure to render aid to the victim as supporting a finding that the defendant acted with reckless indifference to human life. (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant did not "help the victim once he had been shot, but instead fled"]; see also *People v. Nieber*, *supra*, 82 Cal.App.5th at p. 479 [defendant did not "render aid . . . to

9

the victim, whom intruders left lying facedown in a pool of blood"]; *People v. Williams* (2020) 57 Cal.App.5th 652, 664, fn. omitted [defendant "admitted that after the shooting he and his accomplices fled the scene, from which the superior court could reasonably infer he did not call for assistance or attempt to render aid to the victim who did not die at the scene of the shooting"].)  Moreover, rather than render aid to the victim, defendant had the presence of mind to pick up a shotgun shell that might have inculpatory fingerprints on it.  Defendant thus demonstrated that his concern was not for the victim, but to eliminate evidence that might link him to the crime.

Further, defendant knew that Johnson and Harris were drug dealers who were usually armed and might use lethal force.  All of them—Johnson, Harris, Thomas, and Boyse—were members of the Broadway Crips street gang, and defendant himself joined a gang at the age of 15.  Defendant argues, "[T]here was no evidence that those particular gangs, or these particular gang members, had some personal history of violence." However, while defendant may not have been aware of his confederate's likelihood of killing, he was aware they brought weapons, which they were using, and "did not take any steps to [defuse] the situation or minimize the risks of violence."  (*People v. Nieber*, *supra*, 82 Cal.App.5th at p. 479; see also *In re Parrish* (2020) 58 Cal.App.5th 539, 544 ["Parrish knew his cohorts were not peaceable or cautious.  One was a fellow longtime Crips gang member.  The other, according to Parrish, was threatening to kill Parrish himself.  Both wanted to bring guns to the robbery.  This situation differed from cases where defendants had no reason to suspect their fellows were prone to lethal force"].)

In addition, we find defendant's conduct the day after the murder supports the trial court's finding of reckless indifference.  Defendant knew that Prince A. had been shot and killed with a slug from the shotgun.  Yet defendant's reaction to Johnson's complaint that the shotgun had jammed when Boyse cocked it was for defendant to take it upon himself to inspect the gun and test fire it in a park to make sure it remained in good

10

working order.  Defendant displayed more concern for the weapon than for the victim Boyse killed with it.

We conclude that substantial evidence supports the trial court's determination that defendant acted with reckless indifference to human life.  Accordingly, defendant was not entitled to resentencing under section 1172.6.

DISPOSITION

The judgment is affirmed.


_____\s\_____,
Krause, Acting P. J.


We concur:


_____\s\_____,
Boulware Eurie, J.


_____\s\_____,
Ashworth, J.[*]

---

[*]      Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.