Filed 2/25/25  P. v. Sanford CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIC Y. SANFORD,<br><br>    Defendant and Appellant. | B332636<br><br>(Los Angeles County Super. Ct. No. TA087610) |

APPEAL from an order of the Superior Court of Los Angeles County, Connie Quinones, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Eric Ylmo Sanford (defendant) of two counts of first degree murder for his participation in the fatal shooting of two gas station convenience store employees during an attempted robbery in 2006. After intervening changes in the law defining murder, defendant petitioned for resentencing under Penal Code section 1172.6 (former Penal Code section 1170.95).[1] We consider (1) whether the trial court applied the correct beyond a reasonable doubt standard of proof when finding defendant ineligible for resentencing after an evidentiary hearing and (2) whether sufficient evidence supports the court's finding that defendant acted with reckless indifference to human life.

## I. BACKGROUND

### A.   The Offense Conduct

Julio Perez (Julio) was the driver of an SUV early one morning in November 2006.[2] His passengers were his brother Christopher Perez (Christopher); Christopher's girlfriend, Sara Graeff; Loza; and Gilbert Rivera (Rivera).

---

[1]     Undesignated statutory references that follow are to the Penal Code.

[2]     This court granted defendant's request to take judicial notice of the record in his direct appeal from his convictions at trial: *People v. Julio Perez and Eric Sanford* (May 7, 2010, B211015) [nonpub. opn.] (*Sanford I*). Defendant was tried separately from another of the SUV's occupants—Adam Loza (Loza)—and the different trials explain why our factual recitation here varies in significant respects from the factual recitation in Loza's case, which resulted in a published opinion resolving his habeas corpus petition. (*In re Loza* (2017) 10 Cal.App.5th 38.)

2

When the SUV's occupants saw defendant (then 15 years old) on the street, Julio stopped. Defendant had a gun in his hand and approached the vehicle, saying, "Let me in the car, let me in the car." After defendant entered the SUV, he said to the others, "I just shot someone in the head. The cops are going to be here any second. Let's get out. Let's get out." Julio appeared to "laugh[ ] . . . off" the comment. Defendant then put his gun in the back of the SUV.

Defendant, Julio, and Loza subsequently discussed doing a "beer run," meaning someone would "go[ ] into [a] liquor store, grab[ ] an 18 pack of beer, and just run[ ] out." Defendant wanted to do the beer run and Loza agreed to go with him. Defendant asked Loza to hold the store's door open for him so he would not get locked inside.[3]

Around 4:00 a.m., Julio drove to a Mobil gas station and convenience store in Carson. After pumping gas, Julio drove the SUV behind the store. Video from an exterior surveillance camera showed defendant, Julio, and Loza exit the vehicle and congregate near the SUV's rear door. Defendant held the gun at some point, and Julio wrapped a piece of clothing around Loza's face.

Julio turned the SUV around as defendant and Loza entered the convenience store so he could make a getaway. About three minutes later, defendant and Loza ran back to the SUV. Loza was crying and said, "He just shot him, he just shot

---

[3]     Defendant had been locked inside a store on a previous occasion when he attempted to shoplift liquor and pulled a pocket knife on security guards. Also, during a prior beer run at a different location involving Christopher, Julio, Loza, and others— but not defendant—someone ended up locked inside the store.

3

him." Julio asked defendant, "You killed him?" Defendant answered, "I counted to five, I gave her five seconds. She didn't give me the fucking money so I shot that bitch and I shot that old man too." Julio then drove defendant and the other passengers to their respective homes.

The Mobil station's owner, Ronald Hasty, discovered the bodies of two employees, Eduardo Roco (Roco) and Esther Arteaga (Arteaga), around 5:00 a.m. They were inside a bullet-resistant cashier's booth, but the booth's sliding window—usually locked at night—was partially open. No money was missing from the cash register inside the booth. Roco was shot in the chest, and Arteaga was shot in the back. Defendant's fingerprints were found on merchandise left on the counter.

### B.    Defendant's Trial Testimony, Conviction, and Sentencing

As relevant for our purposes, defendant, Julio, and Loza were each charged with two counts of murder plus associated robbery-murder and multiple-murder special circumstance allegations (§ 190.2, subds. (a)(3), (a)(17)). During the defense case at trial, defendant testified and denied killing Roco and Arteaga.

According to defendant, he had no gun when he got into the SUV. He testified he believed Julio was driving him home and he did not want to go to the Mobil station. When he decided to go into the convenience store to buy something to eat, nobody wanted to accompany him. He did see Julio hand Loza "a shirt or a sweater," but defendant "[thought] [Julio] was giving [Loza] the shirt for the cold weather." After defendant entered the store, however, Loza entered wearing the garment over his face.

4

Defendant was standing in front of the cash register, with Loza "[t]wo or three feet behind [him]." As Arteaga was ringing up merchandise for defendant, defendant saw Loza raise a gun. Defendant "backed up" and asked Loza, "What are you doing? What are you doing?" Loza responded, "Don't trip, fool, don't trip."

Defendant testified that Loza pointed the gun at Arteaga and demanded money from the cash register. Roco said the only money in the store was in a drop safe, and Loza responded, "Well, give me the money out the drop safe." When Roco said they could not access the drop safe, Loza told Roco to "[s]top playing with [him]." There was "[s]ome more exchange of words," and then Roco said, "Well, you might as well shoot me because I can't get inside the drop safe." According to defendant, Loza told Roco "you have a certain amount of time" and indicated he was going to count down. When Roco did not produce any money, Loza shot him. Arteaga "[j]umped to the ground," but Loza "reach[ed] in and pull[ed] the trigger again."

Defendant claimed to have been "standing back looking at the whole thing happening." He testified that, after shooting the clerks, Loza "ran to the door" and told defendant to come with him. Defendant followed because he feared Loza "might shoot [him]." When back in the SUV, defendant told the others that Loza had shot the clerks. Once back home, defendant did not call the police because he "was just thinking about [himself] and the safety of [his] family."

During his trial testimony, defendant did concede he previously admitted to investigators that he knew Loza was planning a robbery, Loza got a shirt from the SUV to cover his face, and Loza had a gun. Defendant also acknowledged he

5

participated in the robbery by "pretending like [he was] just a customer."

Defendant's trial jury was instructed, among other things, on felony murder liability. The jury returned first degree murder guilty verdicts against defendant (and Julio). The jury found not true, however, an associated allegation that defendant personally used a firearm causing death or great bodily injury (it did find true the allegation that "a principal" used a firearm causing death or great bodily injury). The jury also found the multiple-murder special circumstance allegation not true and it was unable to reach a verdict on the robbery-murder special circumstance. The trial court sentenced defendant to two consecutive terms of 25 years to life in prison for the murder convictions.

### C. Petition for Resentencing

Defendant filed his petition for resentencing in January 2019. Following an appellate reversal of an initial summary denial of the petition (*People v. Sanford* (June 23, 2021, B305362) [nonpub. opn.].), the trial court appointed counsel for defendant, issued an order to show cause, and held an evidentiary hearing.

The prosecution presented no new evidence at the hearing. The defense, on the other hand, presented testimony from a forensic psychologist, Dr. Carl Osborn. As the trial court would later summarize the testimony,[4] Dr. Osborn discussed "to what extent and [in] what manner" defendant's "developmental immaturity affect[ed] his possible formation of . . . 'reckless

---

[4] Defendant did not make a reporter's transcript of the evidentiary hearing part of the appellate record.

indifference to human life.'" He also testified about "short-si[ght]ed decisionmaking, poor impulse control, vulnerability to peer pressure, and brain studies which included explaining that the development of the brain is still developing in a 15-year-old all the way up to the age 25." Based on his review of the transcript from defendant's murder trial—but without any specific knowledge of defendant's development—Dr. Osborn opined it was "unlikely that [defendant] harbored a mental state of reckless indifference to human life" and believed peer pressure and failure to appreciate risks had influenced his actions.

In an on-the-record oral ruling, the trial court denied defendant's section 1172.6 petition. The court recited it had reviewed the record of defendant's trial (including the transcripts of defendant's police interviews) and the testimony of Dr. Osborn. The court summarized the facts of the murders revealed from these sources, and— perhaps owing to the jury's not true finding on the personal use of a firearm allegation against defendant— did not take a position on who the victims' actual killer was (stating, for example, that "one person" had a gun when defendant and an accomplice entered the Mobil convenience store). Instead, the court opted to analyze defendant's eligibility for section 1172.6 relief as a question of whether, regardless of the actual killer's identity, he was a major participant who acted with reckless indifference to life as defined in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522.

The trial court found defendant was ineligible for relief.[5] The court recognized "[t]he prosecution must prove beyond a

---

[5]    The court also emphasized it was considering "defendant's youth."

7

reasonable doubt . . . each element of the crime of murder under current law in order to establish [defendant's] ineligibility for relief under [section] 1172.6," and the court emphasized its own "responsibility to act as an independent factfinder in determining petitioner's eligibility." And the court found "that the prosecutor has proven beyond a reasonable doubt that [defendant] would be convicted of murder if he were tried again. The court finds that [defendant] is factually ineligible for resentencing pursuant to [section] 1172.6."

## II.  DISCUSSION

Defendant contends the trial court did not apply the correct standard in assessing his eligibility for resentencing and, in any case, substantial evidence does not support a finding that he is guilty of murder under current law. Neither argument has merit.

The trial court's finding that defendant "would be convicted of murder" if tried again is a permissible articulation of the correct standard of proof under section 1172.6, and the court's other comments leave no doubt that it appreciated its duty to decide whether the prosecution proved defendant's present liability for murder beyond a reasonable doubt. As to the merits of that finding, defendant does not dispute he was a major participant in the attempted robbery, and there is substantial evidence that he acted with reckless indifference to human life. In particular, substantial evidence indicates defendant was aware a gun would be used, he in fact supplied the murder weapon, he was present close by (at a minimum) when the victims were murdered, he made no effort to restrain the killer during what was described as a countdown to the shooting, and

he fled after the shooting while making no effort to aid the victims.

### A. *The Trial Court Applied the Correct Standard of Proof*

Defendant contends the trial court "abdicated its responsibility to provide [him] with its independent judgment" and improperly "deferred to a future hypothetical jury" when it stated the prosecution "ha[d] proven beyond a reasonable doubt that [defendant] would be convicted of murder if he were tried again." That is not how we understand the trial court's remarks.

The trial court's finding that defendant is ineligible for resentencing because he would be convicted of murder under current law paraphrases—without substantive change—section 1172.6's provision that a petitioner is eligible for resentencing only if he or she "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) Defendant's counterargument that something more is required to satisfy section 1172.6, subdivision (d)(3)'s requirement that the prosecution prove, beyond a reasonable doubt, that a petitioner is guilty of murder under current law ignores the settled principle that "'"[w]e must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole."'" [Citation.]" (*People v. DeLeon* (2017) 3 Cal.5th 640, 648.) Construing subdivisions (a)(3) and (d)(3) together, a petitioner could presently be convicted of murder within the meaning of subdivision (a)(3) if the prosecution proves their guilt beyond a reasonable doubt. Subdivision (d)(3) illuminates subdivision

9

(a)(3), but it does not supplant it.  A finding of ineligibility couched in terms of subdivision (a)(3) does not imply a departure from subdivision (d)(3).  (See, e.g., *People v. Hill* (2024) 100 Cal.App.5th 1055, 1070 ["The superior court properly could and did deny [the defendants'] resentencing petitions on the ground that they could be convicted under current law"].)

Moreover, even if there were a genuine question as to whether the trial court's finding that "the prosecutor . . . prove[d] beyond a reasonable doubt that [defendant] would be convicted of murder if he were tried again" is consistent with section 1172.6, subdivision (d)(3), the court's other remarks resolve any ambiguity.  The trial court underscored its "responsibility to act as an independent factfinder in determining [defendant's] eligibility" for resentencing.  And it recognized defendant was ineligible for relief only if the prosecutor proved beyond a reasonable doubt "each element of the crime of murder under current law."  That leaves us fully convinced the court was aware of and applied the correct standard.

> B.    *Substantial Evidence Supports the Trial Court's Finding that Defendant Is Ineligible for Resentencing*

"On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the superior court's factual findings for substantial evidence and the court's application of the law to those facts de novo."  (*Hill, supra,* 100 Cal.App.5th at 1066.)

10

### 1. The reckless indifference to human life standard

Until recently, "neither the United States Supreme Court nor California courts offered much guidance about the major participant or reckless indifference standards . . . ." (*People v. Strong* (2022) 13 Cal.5th 698, 705.) Our Supreme Court "first undertook to provide that guidance in *Banks*." (*Ibid.*) The Court set forth a non-exhaustive list of considerations relevant to determining whether a defendant was a major participant and emphasized that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."' [Citations.]" (*Banks*, *supra*, 61 Cal.4th at 807.) The Court further emphasized that "knowledge of the possible risk of death inherent in certain felonies (like armed robbery)" does not constitute reckless indifference to human life. (*Id.* at 809.) "[O]nly knowingly creating a 'grave risk of death' satisfies" the standard. (*Id.* at 808.)

One year later, in *Clark*, our Supreme Court discussed the reckless indifference standard in greater detail. The Court stated, as a general matter, that the requisite reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at 617.) The Court then set forth a non-exhaustive list of "case-specific factors that [it] and other state appellate courts have considered in upholding a determination of reckless indifference to human life," namely, (1) the defendant's awareness that a gun will be used, whether the

11

defendant personally used a gun (even if not to kill the victim), and the number of guns used; (2) the defendant's physical proximity to the murder and, relatedly, opportunities to restrain the killer or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge "of factors bearing on a cohort's likelihood of killing"; and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Id.* at 618-622; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 ["Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation"'"].)

### 2.    *Analysis*

Engaging in an analysis of whether defendant exhibited reckless indifference to human life is admittedly awkward in light of the fact that every occupant of the SUV who testified, save for defendant himself, said he confessed to being the actual killer. But that is how the trial court proceeded, and we shall do the same. As we explain, the "totality of the circumstances" (*Scoggins*, *supra*, 9 Cal.5th at 677) provides sufficient support for the trial court's finding that defendant acted with reckless indifference to human life.

12

"The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at 618, citing *Banks*, *supra*, 61 Cal.4th at 809.) Nonetheless, supplying a loaded gun to an accomplice who uses it to kill can support a finding that a defendant was recklessly indifferent to human life. (*People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [affirming finding of reckless indifference where the defendant gave a loaded gun to the shooter and "made no effort to unload it or to caution [the shooter] about restraining his conduct"]; *In re Parrish* (2020) 58 Cal.App.5th 539, 541, 544 [reckless indifference established where the defendant "supplied" one of two guns used in robbery].)

Here, there is substantial evidence defendant brought the gun into the SUV and had it in his possession outside the Mobil station. It is reasonable to infer he knew it was loaded and gave it to Loza before they went in to rob the store. Indeed, defendant does not dispute these facts or inferences; he instead argues that this analytical factor concerning the knowledge, use, and number of weapons is not alone sufficient to establish reckless indifference to human life. As a theoretical matter, that position appears to be at least in tension with what our Supreme Court has cautioned. (*Clark*, *supra*, 63 Cal.4th at 618 ["no one of these considerations is necessary, nor is any one of them *necessarily* sufficient"], italics added.) But even if defendant were correct, this is not the only factor that supports the trial court's reckless indifference finding.

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder

13

exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at 619.)  A defendant's failure to aid wounded victims can also support a finding of reckless indifference to human life. (*Ibid*.)

Defendant's fingerprints and his own testimony place him at the counter behind which Roco and Arteaga were working when Loza entered the store and demanded money from the cash register.  Although defendant testified he "backed up," even he did not claim he left the store.  Defendant admitted he was close enough to ask Loza what he was doing,[6] but he did not mention any efforts—verbal or otherwise—to restrain Loza.  More important, there were crystal clear "intermediate steps" to the killings in this case that are quite probative of defendant's reckless indifference to life: defendant testified Loza made repeated demands for money, told the clerks they had "a certain amount of time," and indicated he was going to count down to shooting them.  During none of these events did defendant do anything that would suggest he did not share in the actual

---

[6]     Defendant's assertion in his opening brief that because he was serving as a "distraction or decoy" he necessarily "would have been in a different part of the store from where the shooting occurred" has no basis in the record.

14

killer's actions and mental state. Furthermore, even assuming Arteaga was shot very soon after Roco, there is also no evidence that defendant tried to disassociate himself from the first murder or restrain further killing in the interval when Arteaga "[j]umped to the ground" and Loza "reach[ed] in" to shoot her. Similarly, defendant's indifference persisted after the shooting. He made no effort to aid the victims, who were not discovered for nearly an hour, and there is no evidence that defendant believed they were beyond help.

"Courts have [also] looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant." (*Clark*, *supra*, 63 Cal.4th at 620.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid.*)

As we have already discussed in connection with defendant's close proximity to the shootings, the threat of violence escalated over the course of the attempted robbery with Roco repeatedly explaining he and Arteaga were unable to hand over any money. The overall brevity of the encounter was simply the result of Loza not hesitating to make good on his threats. Considered apart from defendant's presence at the scene, however, the duration of the crime at best counsels neither for nor against a reckless indifference to human life finding. (*Scoggins*, *supra*, 9 Cal.5th at 681 [holding that an interaction lasting "between a few seconds and three to five minutes" did not weigh in favor of finding reckless indifference to human life].)

The remaining considerations identified in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 do not

15

meaningfully alter the analytical picture one way or the other. The record does not indicate defendant knew of factors bearing on Loza's likelihood of killing before getting in the SUV on the day of the murders, but defendant undoubtedly knew Loza was so predisposed when he pointed the gun at the clerks when first demanding money—and before the countdown to the shooting began. (See, e.g., *Clark*, *supra*, at 621 ["The d]efendant's knowledge . . . may be evident before the felony or may occur during the felony"].) In addition, there was no evidence that defendant or his accomplices planned or committed the crime to minimize (or exacerbate) the likelihood of violence.

Finally, defendant's young age at the time of the crime is not a consideration identified in *Clark* and *Scoggins*, but the Supreme Court's articulation of factors did not purport to be exhaustive. (*Clark*, *supra*, 63 Cal.4th at 618; *Scoggins*, *supra*, 9 Cal.5th at 677.) As some courts have done (see, e.g., *In re Harper* (2022) 76 Cal.App.5th 450, 470), we shall therefore assume youth is a relevant consideration.

Even considering defendant's age at the time of the offense, the trial court's ruling is still justified. The court could appropriately conclude in making its beyond a reasonable doubt finding that the other factors we have discussed—including defendant's role in supplying the gun used as the murder weapon and his close physical proximity to the shooting—outweighed any relevance of defendant's youth. Indeed, unlike the young defendant in *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 who was found to have been influenced by peer pressure to participate in a carjacking, there is no evidence that anyone in the SUV pressured defendant to participate in the attempted

16

robbery; on the contrary, there is evidence that defendant was the one to first propose doing a "beer run."

## DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


HOFFSTADT, P. J.


KIM (D.), J.

17